888 A.2d 512 (2006)
382 N.J. Super. 264
DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
M.M., Defendant-Appellant.
In the Matter of the Guardianship of M.A.M.
Division of Youth and Family Services, Plaintiff-Respondent,
v.
C.B., Defendant-Appellant.
In the Matter of the Guardianship of M.A.M.
Superior Court of New Jersey, Appellate Division.
Submitted November 29, 2005.
Decided January 12, 2006.
*515 Yvonne Smith Segars, Public Defender, attorney for appellant M.M. (Gladys Moriarty, Designated Counsel, on the brief).
Yvonne Smith Segars, Public Defender, attorney for appellant C.B. (Philip Lago, Designated Counsel, of counsel and on the brief).
Peter C. Harvey, Attorney General, attorney for respondent in both appeals (Andrea M. Silkowitz, Assistant Attorney General, of counsel; Patricia O'Dowd, Deputy Attorney General, on the brief).
Yvonne Smith Segars, Public Defender, Law Guardian for M.A.M. (James A. Louis, Deputy Public Defender, of counsel; Jane M. Personette, Designated Counsel, on the brief).
Before Judges KESTIN, HOENS and SELTZER.
The opinion of the court was delivered by
KESTIN, P.J.A.D.
In these consolidated appeals, M.M. and C.B. each appeal from a judgment entered by the trial court on May 10, 2005, terminating their parental rights with respect to their son, M.A.M., and awarding guardianship over the child to the Division of Youth and Family Services (DYFS or Division). M.M. and C.B. each argue that the trial court's respective findings and conclusions were not supported by clear and convincing evidence that all of the four statutory criteria for termination of parental rights had been satisfied. N.J.S.A. 30:4C-15.1a. See Division of Youth and Family Servs. v. A. W., 103 N.J. 591, 604-11, 512 A.2d 438 (1986).
In every instance in which termination of parental rights is sought, a balancing judgment is required between competing factors. The balance implicates fundamental rights and interests of the parents and the children, as well as critical governmental concerns.
The right of parents to enjoy a relationship with their children is of constitutional dimension. In re Guardianship of K.H.O., 161 N.J. 337, 346, 736 A.2d 1246 (1999) (citing Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)); In re Adoption of Children by G.P.B. Jr., 161 N.J. 396, 404, 736 A.2d 1277 (1999); Adoption of Children by L.A.S., 134 N.J. 127, 631 A.2d 928 (1993); A. W., supra, 103 N.J. 591, 512 A.2d 438. Parents have a fundamental liberty interest in raising their biological children. Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599, 606 (1982). Both the federal and State constitutions protect the integrity of the family unit. Stanley, supra, 405 U.S. at 651, 92 S.Ct. at 1212-13, 31 L.Ed.2d at 558-59; A.W., supra, 103 N.J. at 599, 512 A.2d 438.
The law presumes that parents will act to promote the best interests of their children. See Parham v. J.R., 442 U.S. 584, 602, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101, 118 (1979). However, "experience *516 and reality may rebut what the law accepts as a starting point...." Id. at 602, 99 S.Ct. at 2504, 61 L.Ed.2d at 119. The incidence of child abuse and neglect cases demonstrates that some parents may act in ways that undermine the interests of their children rather than advance them. Ibid.
Government "is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." Id. at 603, 99 S.Ct. at 2504, 61 L.Ed.2d at 119 (citing Wisconsin v. Yoder, 406 U.S. 205, 230, 92 S.Ct. 1526, 1540, 32 L.Ed.2d 15, 33 (1972)). The State as parens patriae may act to protect children from serious physical and emotional harm. This may require partial or complete severance of the parent-child relationship. Yet, "[f]ew forms of state action are both so severe and so irreversible." Santosky, supra, 455 U.S. at 759, 102 S.Ct. at 1398, 71 L.Ed.2d at 610.
When a biological parent resists termination of his or her parental rights, the courts' function is to decide whether that parent has the capacity to eliminate any harm the child may already have suffered, and whether that parent can raise the child without inflicting any further harm. In re Guardianship of J.C., 129 N.J. 1, 10, 608 A.2d 1312 (1992). The focus of our inquiry is not only whether the parent is fit, but also whether he or she can become fit to assume the parental role within time to meet the child's needs. Ibid. "The analysis of harm entails strict standards to protect the statutory and constitutional rights" of the biological parents. Ibid. The burden rests on the party seeking to terminate parental rights "to demonstrate by clear and convincing evidence" that the risk of "serious and lasting [future] harm to the child" is sufficiently great as to require severance of parental ties. Ibid.
The balance between fundamental parental rights and the State's parens patriae responsibility is promoted by the law's best-interests-of-the-child standard. K.H.O., supra, 161 N.J. at 347, 736 A.2d 1246. Under that principle, parental rights may be severed when:
(1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
(4) Termination of parental rights will not do more harm than good.
[N.J.S.A. 30:4C-15.1a.]
See also A.W., supra, 103 N.J. at 604-11, 512 A.2d 438.
These tests are inter-related and overlapping; they are designed to identify and assess what may be necessary to promote and protect the best interests of the children. K.H.O., supra, 161 N.J. at 348, 736 A.2d 1246. The considerations involved in determining parental unfitness are "extremely fact sensitive" and require particularized evidence that addresses the specific circumstances of the individual case. Ibid. (quoting L.A.S., supra, 134 N.J. at 139, 631 A.2d 928).
*517 In reviewing the factual findings and conclusions of a trial judge, we are obliged to accord deference to the trial court's credibility determinations and the judge's "feel of the case" based upon his or her opportunity to see and hear the witnesses. Cesare v. Cesare, 154 N.J. 394, 411-13, 713 A.2d 390 (1998). We are not to disturb the judge's findings of fact unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Id. at 412, 713 A.2d 390 (quoting Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974)). And, the conclusions that flow logically from those findings of fact are, likewise, entitled to deferential consideration on appellate review. See Cesare, supra, 154 N.J. at 412, 713 A.2d 390; Rova Farms, supra, 65 N.J. at 484, 323 A.2d 495.
Our obligation to defer to the trial court does not extend to issues of law, however. "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty v. Township Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995).
With all the foregoing standards in mind, we turn to the facts of the matter. The trial judge consistently referred to this case as entailing a special problem: one person of a couple who is a competent parent and another who is not.
M.A.M., the child who is the subject of this proceeding, was born on January 7, 2003. C.B., the mother of M.A.M. was thirty-one years of age at the time of trial. M.M., the father, was fifty-nine. The parents have another child, a daughter, C.M., who was born on October 30, 1993, and resides with them. C.B. and M.M. have lived together for about fifteen years and continue to maintain a household. The family's case history with the Division predates the birth of M.A.M. C.B. concedes that "[t]here had been at least seven prior referrals regarding [C.M.]."
M.A.M. was placed with the foster parents on January 23, 2003, sixteen days after his birth. He has lived with them ever since.
The trial court found that, when M.A.M. was born, hospital personnel expressed concern with C.B.'s apparently
limited cognitive capacities[,] ... hygiene, and [that] she appeared to be overwhelmed by the prospect or obligation of caring for the newborn.... [F]urther investigation by the Division [produced] concerns about the home environment, concerns about the general stability of the home, the financial stability, and some issues regarding cleanliness, although ... [the older child's] room was always neat and clean.
The record discloses that the infant also suffered from hyperglycemia. Hospital personnel were specifically concerned with C.B.'s apparent inability to deal properly with this condition, especially with respect to the feeding regimen required to maintain proper levels of glucose.
The trial judge referred to "documentation" that indicated C.B. had been "subject to some abuse in her younger days and that it is carried over and, unfortunately, had an impact on her as time has gone on." He found as a fact that her I.Q. was in the mid-sixties and
that's an explanation to a certain extent of why conclusions have been reached regarding her cognitive limitations. I think that the evidence established that [C.B.]'s cognitive limitations are severe. There was testimony that she operates... in many describable and measurable ways on ... the level of a five-year-old. *518 I think that in some ways socially she is more adept in certain contexts.
From the evidence, primarily the testimony of M.M., the judge concluded that C.B. could "be brought along and made productive in ways that go beyond ... what a five-year-old is capable of," both in assisting M.M. in his work and in the "family setting," but the judge stressed "the limits we're working with."
He went on to find from the evidence that C.B.
is subject to substantial immaturity. There recently has been prominent and has come to my attention and I think is established by the evidence an alcohol problem which exacerbates some of the other problems that we're talking about.
And also the history of the case has pretty clearly established what I would call a very destabilizing and negative pattern of behavior in terms of periodically running away from the home and sometimes bringing allegations of domestic abuse against [M.M.] which my reaction to and based upon her frequent recantations of them ... are false, but in any event, there has been a pattern which I'll get into more of very disruptive and damaging behavior ... in terms of the family stability of running away from home.
It has had an impact on the general stability of the family and also a negative impact on [C.M.], who has seen her mother come and go in this way and it's been a problem. So that is one person who's involved in the equation here.
Turning to M.M.'s parenting history, the judge expressly found, from both the evidence at trial and based on his impressions as the case had matured, that M.M.
is an industrious hardworking individual. He overcame previous life problems with drugs and his family, and brothers and fathers had a lot of negative things happen to them because of different life issues including substance abuse issues. He had spent time in jail ... for drug issues, but I find that at this time ... he's overcome those problems and ... that he is ... industrious and hardworking.
I agree with Dr. Fulford[, M.M.'s expert,] and Dr. Dyer, [the Division's expert,] and I think Dr. Dyer coined the phrase that he is very invested in domesticity which is an important feature of this case. His family is central to him, very important to him. That's where he puts his energies. He's working and he's taking care of his family. That's what he does.
He was characterized[,] I believe by Dr. Dyer[,] as a straightforward individual, and ... I do not find that he is disqualified as a parent by any currently active elements of his personality.
The judge accepted the favorable testimony of a social service provider regarding M.M., proffered by the Division, which the judge summarized as characterizing M.M. as "work[ing] hard at making improvements in his life situation and the situation of his family. He wants the best for everybody. She also noted that he struggles with his relationship with [C.B.] because ... he wants to work hard and do right by his family...." The judge stated: "I find that to be true, all of those positive things."
According to the judge, the Division's expert, Dr. Dyer, had also testified "in a positive way regarding [M.M.], ... [but] some limitations [were] noted." The judge observed that M.M. "is not a sophisticated person," but, he quoted from Dr. Dyer's report as follows, characterizing the selected passage as "a good summary of Dr. Dyer's perspective," and basing some of his findings on those views:

*519 "[M.M.] appears to be functioning with the range of psychological normality. There is no evidence of thought disorder, mood disorder or grossly disturbed reality contact in this protocol. There was no evidence of pathological narcissism or antisocial traits. There was no evidence of the sort of domineering and controlling personality often found in individuals who are the perpetrators of domestic violence."
The report goes on to say that: "[M.M.] places a very high value on religious involvement."
It goes on further ... to say that he is heavily invested in domesticity, that he generally desires to have his youngest son returned to his custody and that, of course, was an expert that was testifying on behalf of the Division just to put it in context, and I obviously characterize those as very positive characteristics.
During the bonding assessment, it was noted again by Dr. Dyer ...:
"[M.M.] behaved in an entirely appropriate fashion towards his son, [M.A.M.] during the bonding assessment. [M.M.] was appropriately nurturing and involved with the child in constructive play activities. He related to [M.A.M.] on the child's level and was able to offer him adequate cognitive and language stimulation during the session. It is obvious that [M.M.] loves this child and that he genuinely desires to have [M.A.M.] placed in his care even if it means that he has to shoulder the entire burden with [C.B.] completely excluded as a caretaker."
The judge then went on to emphasize that contrasts between M.M. and C.B., which, he stated, "sets up ... the essential problem in the case:"
[A]ll the experts ... agreed that M.M. is a competent parent and dedicated parent.
The problem in the case as I see it the problem that unfortunately C.B.[,] for reasons through no fault of her own[,] essentially because of damage that was done to her in my opinion earlier in life that is documented in the psychological evaluation .... [including] references to sexual abuse commencing when she was eight years old and continuing for many years. There's reference in Dr. Dyer's psychological examination of [C.B.] in his conclusions that, again, she had a difficult childhood herself and that is the explanation for a lot of the cognitive and behavioral issues that are important in this case.
Focusing on the older child, whose status was not directly at issue, the judge, once again, highlighted the central problem of the case, i.e., the essential competence of one parent and the inabilities of the other where they share a household. He reiterated his finding that M.M. is a competent parent, and continued:
So the problem in the case as I see it is this. We have a situation where we have one parent who is I think it's fair to say a competent parent. In a sense, the Division has agreed with that assessment in that [C.M.] is a child who I think properly so has been left in the care principally of [M.M.]. [C.B.] is in the household also, but it is [M.M.] who has the responsibility for taking care of [C.M.] and I think he's done a good job.
[C.M.] is described as a well behaved, dutiful daughter, well liked by others. There is an issue of what's been called "parentification" and other trauma that is the result of [C.B.'s] periodic elopements from the family, which I'll deal with at another time in my decision, but [C.M.] ... is now eleven years old and *520 ... I think the Division has made a good choice in not removing [C.M.] at any point.
The reality is you have to look at each child separately and look at what's in the best interest of each child separately and I think it might have been easier for the Division in some ways to just broadly refer to family instability and issues and running away and all of that that we'll be discussing and say, well, no child should stay in this household, but I believe there has been a sensitivity to the situation of both children, and Dr. Dyer concluded and I agree that ... certainly the damage to [C.M. from] any removal would far outweigh any benefit certainly at this stage in her life based on bonding issues and comfort issue, and she is in my view doing reasonably well in sometimes difficult circumstances.
Once again regarding "the central issue in the case," the judge said:
What has come down as the fundamental problem in the case has been the instability in the home and the periodic elopement or leaving or running away or however you want to characterize it by [C.B.], and that was a concern at the time of the initial removal.
Obviously, there was concern about cognitive limitations and general capacity of the mother to care for a newborn and I don't think that's changed, and perhaps based on the cognitive limitations, it couldn't change.
There were also concerns regarding the general stability of the relationship between the biological parents and [C.B.]'s limitations or what gave rise to that concern, and the history of the case is one in which there have been repeated runnings away. I believe the evidence established that there were approximately twelve occasions between May of 2002 and the present time when [C.B.] has left the residence and .... this is what I find the situation to be[.]
[M.M.] is dedicated and devoted to... [C.B.] He believes and I think accurately that he knows her better than anybody else and he can do a better job in helping her live a productive life and be a moderately good member of the family.
On those grounds, he is unwilling to in effect despite runnings away and on one occasion I believe there was evidence that [C.B.] took some money out of the household, money that was earmarked for rent, despite the fact that she has made what I find to be false allegations of domestic violence against [M.M.] and then has ... recanted them.
He is always willing to take her back, and I think it's just his judgment that  well, first of all, he's devoted to his partner, if that's a proper phrase. He's devoted to the mother of his children. He's devoted to his concept of the family in keeping it together and dealing with everybody's issues ..., but that's not an easy thing to do in this situation.
And I have to say that this is a very unusual scenario in which you're looking at a family and considering their capacity to provide a safe and stable home for a child, and you're dealing with repeated running away and that has been the problem of the case as we've gone from January of 2003 forward, and I think it's fair to say that if we had overcome that problem, it probably would have been the case that at some much earlier time, the child would have been returned presumably to a stable household, and the case would be different.
What has happened is because we have not conquered ... what I'll call the running-away problem, regarding the issue of family stability, relationship stability and the ability to provide a stable *521 home on the issue of elopement or running away or however you want to characterize it, it hasn't changed since certainly during the course of the case, and of course, the cognitive limitations haven't changed. So it's really sort of in the same place.
The judge then discussed the effects of the "running-away problem" on the older child, C.M., quoting a remark attributed to her that "[s]he did not want her mother home because she doesn't want her brother to go through what she has gone through." He noted that, although C.M. had felt the effects of C.B.'s disruptive conduct, the Division's expert, Dr. Dyer, had evaluated her as a "parentified child," and the judge believed that conclusion to be "based primarily upon [C.M.]'s need to accommodate the limitations of her mother in general and specifically in the household." The judge found as fact, based on Dr. Dyer's evaluation, that, because of C.B.'s conduct, C.M. experienced "an elevated level of anxiety" and "internalized suffering." He found also that M.M. was dealing with the problem "reasonably effectively."
The judge "sum[med] up" on his analysis of the family dynamic:
I agree with the Division's judgment not to seek removal of [C.M.]. I think [M.M.] is doing a good job of mitigating the harm done by this dynamic, both through his own personality and attentiveness and dedication to [C.M.] and also his network of supporting friends and the fact that he is just dedicated to family life. So I think it's  the harm is being mitigated, but it is an issue, and it is present in the way that I think Dr. Dyer recognized.
He then "turn[ed] briefly to some assessment of [the child M.A.M.] as it impacts on this judgment."
[M.A.M.] has been in almost continuous placement with his foster parents since birth and is doing reasonably well there.
There were some developmental issues that had to be addressed. I don't find that the developmental  and when I say "issues," there were references to a need for some muscle-tone improvement, physical therapy associated with that. There were some general developmental issues, intellectual developmental issues.
I don't find them to be acute, but he is a child that I think needs some special attention.... I think that [M.M.] once again would be dedicated to be making sure that he got it if he were in his care, but I do find that [M.A.M.] is a child with some special needs, not acute, but still not trivial and that is an element in the case also.
The judge's oral opinion continued:
Now, getting back to the family dynamic, [in] ... Dr. Dyer's report, there's a discussion once again of the running-away scenario. It appears ... that [C.B.] has made allegations to family friends and police of physical abuse by [M.M.] which is then followed by recantations.
It appears at one point that she was charged by the ... Police for false allegations along these lines.
The dynamic referred to in this report and what I find to be the case is that [C.B.] would run away for some period of time, usually days, or in some instances, weeks, would eventually return home, be very sorry and promise not to repeat the behavior, but that pattern has been repeated over and over again during the history of the case and is, of course, an unsettling dynamic.
At various points, [C.B.] indicated that she wouldn't be going back home although she changes her mind. At various times, [M.M.] has said, you know *522 what, I can't deal with this anymore, I'm not going to let her return home this time, but what I find is the situation is this, that [M.M.], and perhaps properly so, is committed to [C.B.] as an individual, is committed to her as the mother of [C.M.] and [M.A.M.], and I don't find that he's ever going to turn her out.
I believe his testimony that he knows more about her than most people, and he cares more about her and I don't know anybody else in her life. I think he enhances her life, gives her a context in which she can be productive; that is, at work and part of a family and a nice family including [C.M.] and I think [M.M.] is dedicated to that. So I think we have to assess the situation as that being the family unit.
Observing that the Division had not sought an order restraining C.B. from the household, and referring to the Division's position that "[it did] not ... advocat[e] divorce of parents" but, rather, "work[s] with the family as it presents itself," the judge agreed that it was "not appropriate for the Court or for the Division to command that the family unit be broken up." He opined that such a result would be harmful to the older child, C.M., and would unnecessarily
hurt [C.B.] to be compelled to leave the family, in effect. This is a place where I think [M.M.] has established a niche for her, a place for her to be in the world.
She can work with him as a helpmate in the dry-cleaning efforts and also cleaning the post offices as he testified to, and in doing so, she contributes to the family and ... she enhances her own life by being productive in that context.
So I cannot argue with [M.M.]'s choice in that situation. I can't rule against his dedication to [C.B.]. I admire it. He is a good man for doing that.
The judge continued recounting how, notwithstanding her promises to her daughter that she would not leave anymore, "unfortunately[,] because of her limitations, [C.B.] sometimes means well, but is unable to carry it out for any extended time[.]" The same inability applied to her repeated false allegations, always later recanted, of domestic violence against M.M.
The judge noted the plethora of services and evaluations provided to the parties by the Division over the years, none of which had successfully addressed the problems manifested by C.B. He continued:
So those are a lot of the elements and dynamics in the case, and as I've mentioned, there are both positive and negative elements here. The negatives I've talked about enough and they principally can be characterized as concerns about the family stability, concerns about placing another child into that situation.
The positives are essentially centered around [M.M.] who is an industrious hardworking decent person, and I find that to be the case. That's what makes it a difficult case.
* * * *
... I have to reconcile what I have called the positive and negative elements in the case. I feel very sorry for [C.B.] in the sense that she has been afflicted by things that were not of her choosing or causing, but she has to deal with them. I also will reiterate my respect for [M.M.] ... but he has[,] under difficult circumstances I think[,] been consistent in trying to keep his family together, put it together, pull it together and live a competent and healthy life in our community.
The judge then turned to an assessment of the legal effects of the facts he had found. He identified the statutory tests *523 and recited the clear-and-convincing evidentiary standard; and he invoked the overarching value of advancing the best interests of the child. He focused upon the essential interrelationship of the statutory standards, and noted that because of the special features of the family dynamics at hand he had "struggled with this case." He concluded:
So this is my thinking regarding where we wind up. The concern of the Division at the time of removal, and I'm going back again to the birth of [M.A.M.], had to do with again the cognitive limits of [C.B.,] ... her inability really to be a caretaker directly and be the one responsible for the care of an infant or a child and I think all acknowledge that she does not have capacity, and particularly in light of the running-away problem, the Division was concerned about the family stability and general financial and other issues in this home.
I do find that their assessment at that time was on target and that there was a risk to the child. There were risks identified at birth because of the cognitive limits of [C.B.] There were issues of instability that I previously referred to, and it turns out there was a significant substance abuse issue in the case aggravating [C.B.]'s situation that also contributes to the establishment of the first prong of the four-prong test.
That is, that the child's safety, health and development was endangered by the situation that the family presented back on January 7th, 2003.
One of the issues in this difficult and complex case is that at that same time, the Division and of course, by implication of the Court and perhaps the law guardian made a parallel judgment that [C.M.] was not endangered in the way that a newborn would be and the decision was made to, of course, leave [C.M.] in place. I think that's appropriate. That was an appropriate judgment.
[C.M.] is [a] different child with a different history, a child who had accommodated herself to the difficulties of the family, and I believe although there are some negatives that are associated with these difficulties for [C.M.], I agree with the Division's judgment in not seeking that removal and I note [from] ... Dr. Dyer's report ... on [C.M.]: "Any placement of this child"  meaning [C.M.]  "outside the home would be extremely destructive for her, with a traumatic impact of removal far outweighing any conceivable benefits."
I think that's so. I think that [C.M.] is living a reasonably competent life, and it's a shame she has to deal with the limitations that I've discussed at length, but that's the way her life is and it is I think it is reasonable to hope that she is also learning some positive lessons through [M.M.]'s positive example, and I agree with the judgment that was made at that time to conclude that this family was not in a position to have a second child added to the equation because of the substantial and repeated destabilizing elements of the situation principally and also the limits of the biological mother that I referred to.
And the second prong is that there has been an inability to eliminate the harm facing the child, and that has unfortunately been the history of the case. In the specific language of Prong Two,... it poses the question [whether we are] able to provide a safe and stable home for the child, and that has just not been the situation, and through each year of the case, there has been repeated disruptions of the stability of the family.

*524 I also believe, and I think this is pretty obvious, a delay in permanent placement will add to the harm. The child has been in placement for nearly two years and the case needs to be resolved.
Regarding the third prong, the reasonable efforts, I've already outlined the various services that were provided. I neglected to mention the Department of Developmental Disability [which] also provided evaluations and other services in this context. The goals in effect were always family stability and unfortunately... those really never were achieved through these services, although I think in context they were reasonably directed towards that end. So I do find that the third prong is satisfied by clear and convincing evidence.
The fourth prong is that the termination of parental rights will not do more harm than good. In the context of this case, of course, the foster parents have been in place since January of 2003, in effect, just ... after [M.A.M.] was born. I got a chance to evaluate them both through the history of the case and the appearance of the foster father here, and they have done a good job being called on to provide this service and they appear to be very decent people.
I heard testimony that they have made an effort to include the birth parents in the child's life above and beyond what we usually see. They are compassionate people but the most important element as far as the foster situation goes is as follows and what I find to be the case and it stands to reason. The child is, of course, deeply bonded now based on just the fact that he's been with the fosters for two and a half years and they have provided competent and nurturing care.
I think Dr. Silikovitz agreed and Dr. Dyer certainly offered the opinion and it's really just common sense to me that the foster mother is ... what he characterized as the center parental love object, that the child is profoundly attached to the foster parents and that the loss of this bond would be severe and traumatic and would cause enduring harm.
Now I note that Dr. Dyer at the same time concludes that [M.M.] because of the positive qualities that I have noted over and over again would be in a position to mitigate to some extent that harm, although that would be limited by his very broad obligations to earn a living, care for [C.M.], in effect care for [C.B.] and adding the burden of another child, he's got a lot on his plate, but he would to some extent be able to mitigate this severe and enduring harm if there were removal from the foster parents with whom the child is strongly bonded.
But, in the final distillation of it all with these overlapping four prongs, if you look at the language of Prong Two and the discussion of the capacity to provide a stable home and when you look at the notion that the competing interests here, the parents' rights have to be viewed in light of what's in the best interests of the child, that's where when you look at what has happened in effect is we've been unable to deal with the fundamental issue of instability throughout the history of the case.
The child now has a significant bond with the foster parents, and it would be wrong and it would be doing more harm than good to cause that traumatic harm to the child at this point. So I find that the fourth prong is satisfied.
I note that there was some discussion in the case that in some sense the foster parents would be open to a continued *525 relationship with the biological parents. Although I hope that that happens, I really can't give it much weight in the sense that who knows what the future will bring, although I very much hope that that will happen.
On an application from M.M.'s attorney to continue visitation pending appeal, the judge expressed an inclination "not [to] change anything ... because of the unusual dynamics of the case, and there was a suggestion that there may be a continuing relationship possible here." He inquired about the possibility of "post-judgment mediation" to achieve that end. After some colloquy, the judge expressed a preference that the application to establish a continuation modality pending appeal be made in writing. In the end, as far as we can determine from the record on appeal, except for a provision in the judgment for guardianship that "visitation shall continue, pending written application to the court[,]" no order was made to any further effect.
We are in substantial agreement with the trial judge's evaluation as regards the parental rights of C.B. The evidence established, clearly and convincingly, that she was incapable of discharging her parental responsibilities capably and dependably. As to her, the proofs amply satisfied every element of the four-part statutory standard, including the likelihood of continuing harm to the child if C.B.'s parental rights were not terminated.
The bottom-line evaluation regarding M.M., by any fair understanding of the proofs, was flawed, however. The trial judge found repeatedly that M.M. was a capable and competent parent. Because of his devotion to C.B. and her needs, he was unable to remedy the pernicious effects of her irresponsible conduct on the children and, especially, the harmful potential of her serious limitations in her inability to meet M.A.M.'s special needs. Nevertheless, one parent cannot be held responsible for the shortcomings of the other, at the cost of forfeiting his parental rights; the non-culpable parent is obliged only to exert reasonably successful efforts to protect the child from the harm inflicted by the deficient parent. This, as the trial judge found, M.M. has done, however imperfectly, but reasonably, with respect to the older child; and, as the trial judge also found, M.M. could be expected to do the same with respect to M.A.M. In sum, there was no evidence in this matter establishing clearly and convincingly that, by the standards of N.J.S.A. 30:46-15.1a, M.M.'s parental rights could validly be terminated.
To be sure, the child  almost two-and-one-half years old at the time of trial, and now barely three years old  has bonded with the foster parents, who have done admirably fine work in providing for him and meeting his special needs. But the fact of bonding between foster parents and subject child  even with a proper focus on the best interests of the child  cannot be a surrogate for the showings and proof standard mandated by statute, without some special showing of substantial and particularized evidence that serious psychological or emotional harm will be inflicted on the child by separating him from the foster parents. See J.C., supra, 129 N.J. at 17-26, 608 A.2d 1312. Here, from the expert opinions in the case, we discern no such harm that will come to this child from careful and sensitive efforts to reunite him with his father.
Accordingly, the judgment terminating M.M.'s parental rights must be vacated. The potential for some trauma to the child from shifting him from the care of the foster parents to M.M.'s custody will, fortunately, be likely mitigated by the commendable efforts, over the course of the matter, on the part of the Division, M.M. himself, and the foster parents in continuing *526 a significant, distinctly positive and constructive, relationship between M.M. and the child through frequent and regular visitation.
Even so, in the best interests of the very young child, the custodial shift that occurs as a result of this opinion should not be abrupt. Rather, the Division must develop a reasonable mechanism  subject, of course, to ongoing supervision by the trial court  for gradually increasing the time the child spends with M.M. and enhancing the circumstances of their time together, until the point is reached when a changeover is appropriate. And, of course, the ultimate changeover after the weaning period should not signal a more abrupt disengagement of the foster parents from the child's life than would be in his best interests and agreeable to them.
Moreover, DYFS's continuing involvement with the family is clearly necessary, at least for the time being, to render such services to the members of the household as may be required in the circumstances. It will not be simple, as a matter of day-to-day living and relationships, for M.M. to discharge his parental responsibilities as the sole parent of M.A.M. while C.B. remains a part of the household. But it is essential that he develop the wherewithal to do so. Past experience suggests that he has learned how to provide for his children during periods when C.B. has been absent and he has  with some success that may be built upon through counseling services provided by the Division  figured out how to mitigate the harm that flows from those absences, C.B.'s return, and her generally unpredictable behavior. We leave it to him as M.A.M.'s only legal parent, with DYFS's assistance, to continue working to promote the best interests of the children in the household, including determining in respect of M.A.M., just how much involvement C.B. ought to have in the life of the child to promote that child's best interests.
We commend the trial judge for the understanding and sensitivity he brought to the matter; and we understand the difficulty he experienced in achieving a result that was both realistic and in conformity with legal standards. We disagree with him, in part, purely as a matter of law, with high regard for the wisdom and insight he applied.
As to the termination of C.B.'s parental rights with regard to M.A.M., we affirm. As to M.M.'s parental rights, we reverse the judgment terminating his parental rights. We remand for such further proceedings and orders as may be necessary to ensure continuing agency services and court supervision to this family unit in order to promote M.M.'s exercise of parental rights and responsibilities in the best interests of the child, M.A.M.