# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3282-20
                    A-3284-20

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

K.C. and R.N.,

     Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
J.N.N., a minor.

_____

     Argued July 11, 2022 – Decided July 22, 2022

     Before Judges Fasciale and Enright.

     On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket No. FG-08-0018-21.

Ryan T. Clark, Designated Counsel, argued the cause for appellant K.C. (Joseph E. Krakora, Public Defender, attorney; Ryan T. Clark, on the briefs).

Phuong V. Dao, Designated Counsel, argued the cause for appellant R.N. (Joseph E. Krakora, Public Defender, attorney; Phuong V. Dao, on the briefs).

Adam R. Meisle, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Acting Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Adam R. Meisle, on the brief).

Margo E. K. Hirsch, Designated Counsel, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Margo E. K. Hirsch, of counsel and on the brief).

PER CURIAM

In these related consolidated appeals, defendants K.C. (the mother) and R.N. (the father) assert the Family Part wrongfully terminated their parental rights to their child J.N.N. (the son) under Title 30 after a guardianship trial. The Division of Child Protection and Permanency (Division) removed the son shortly after his birth in 2019, and placed him in a non-relative resource home, where he remained through the trial. The Honorable Mary K. White, J.S.C., presided over a virtual trial, entered the judgment terminating their parental

2

rights, and rendered a thoughtful and comprehensive oral decision. We now affirm the judgment in its entirety.

I.

A parent has a constitutionally protected right to "raise one's children." N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 599 (1986) (quoting Stanley v. Illinois, 405 U.S. 645, 651 (1972)); Santosky v. Kramer, 455 U.S. 745, 753 (1982). But that right is not absolute. Ibid.; N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014). Parental rights are "tempered by the State's parens patriae responsibility to protect the welfare of children," In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999), when the child's "physical or mental health is jeopardized," A.W., 103 N.J. at 599 (quoting Parham v. J.R., 442 U.S. 584, 603 (1979)).

The Legislature created a test to determine when it is in the child's best interests to terminate parental rights to effectuate these concerns. See K.H.O., 161 N.J. at 347 (stating that "[t]he balance between parental rights and the State's interest in the welfare of children is achieved through the bests interests of the child standard," as noted in N.J.S.A. 30:4C-15(c) and elaborated upon in N.J.S.A. 30:4C-15.1(a)). To terminate parental rights, N.J.S.A. 30:4C-15.1(a) requires the Division to prove four prongs by clear and convincing evidence:

(1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm[1];

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the [judge] has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

See also A.W., 103 N.J. at 604-11 (applying the four prongs). The four prongs of the test are "not discrete and separate" but "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348. "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." Ibid. (quoting In re Adoption of Children by L.A.S., 134 N.J. 127, 139

---

[1] We are aware that on July 2, 2021, the Legislature enacted L. 2021 c.154, § 9 amending N.J.S.A. 30:4C-15.1(a) pertaining to the standards for terminating parental rights. Specifically, the Legislature amended N.J.S.A. 30:4C-15.1(a)(2) to exclude from consideration in a termination of parental rights case the harm to a child caused from being removed from resource parents.

(1993)). In turn, "the trial [judge's] factual findings 'should not be disturbed unless they are wholly unsupportable as to result in a denial of justice.'" In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)). We thus generally uphold those findings so as long as they are supported by "adequate, substantial, and credible evidence." R.G., 217 N.J. at 552. We also consider the particular expertise of the Family Part, which repeatedly adjudicates cases brought by the Division under Title 9 and Title 30 for alleged abuse or neglect of children. See, e.g., N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012) (stating that we defer "to the factfindings of the family [judge] because . . . [he or she] possesses special expertise"). Our deference is also informed by the Family Part judge's "feel of the case." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 293 (2007)).

## II.

We will not repeat the facts at length. Suffice to say that prior to the son's birth in February 2019, the Division had monitored and investigated the mother and father numerous times after receiving referral reporting concerns of abuse

and child neglect regarding the mother's two other children (the children)[2] from a different paramour. The Division's investigations revealed that the mother was using heroin, one of the mother's children had not been to school for weeks, the mother was once "on the run" because she stole $6,000 worth of jewelry, cash, and prescription medication from her family, and that the father had been sexually, emotionally, and physically abusing the mother's children. The mother admitted she knew the father physically abused her elder son and sexually abused her daughter. During these investigations—and up until the son's birth— the father and mother were both uncooperative with the Division and the father would scream at and engage with Division workers. The Division ultimately removed the children from the mother and father's home and placed the children with an aunt and in a foster home, respectively. Around this time, police arrested and charged the father with two counts of endangering a child and criminal sexual contact. The father's charges were pending at the time of trial.

The mother tested positive for methadone when she gave birth to the son. The son was diagnosed with Neonatal Abstinence Syndrome and had to spend over a month in the Newborn Intensive Care Unit. When the Division came to the hospital to speak with the mother and father, the father became upset and

---

[2] The children are not the subject of the judgment under review.

A-3282-20

threatened to take the son from the hospital. Security escorted him out of the hospital. Also, at this time, around February 2019, the mother and father's home did not have working heat.

Because of these factors and the Division's prior concerns regarding the mother and father's drug abuse and abuse and neglect towards the children, the Division removed the son upon his discharge from the hospital. The mother did not provide any family members who could be potential placements for the son, and the father offered his parents for a potential placement, but they were unresponsive. The Division placed the son in a non-relative resource home. The Division then scheduled two evaluations, one for the mother and the other for the father, which led to numerous recommendations for various services.

In January 2020, the father ended his relationship with the mother, and she moved out of their home. The mother attended domestic violence workshops and counseling but maintained contact with the father. She eventually moved back in with the father. During this time, in-person visitation was paused and replaced with virtual visitation until August 2020 because of the COVID-19 pandemic. During this pause, the father harassed the resource family to try and schedule visitations with the son.

On appeal, the mother argues:

7

[POINT I]

THE TRIAL [JUDGE] APPLIED THE INCORRECT LAW AND CAUSED A LEGAL ERROR IN TERMINATING [THE MOTHER'S] PARENTAL RIGHTS.

[POINT II]

[THE MOTHER] DID NOT RECEIVE EFFECTIVE ASSISTANCE OF COUNSEL WHERE COUNSEL FAILED TO CALL WITNESSES WHO WOULD HAVE UNDERMINED THE HOLDING THAT [THE MOTHER] "THREW AWAY" A HOUSING VOUCHER, FAILED TO CORRECT THE [JUDGE'S] MISSTATEMENT OF LAW, FAILED TO OBJECT TO HEARSAY, AND FAILED TO ADVISE [THE MOTHER] THAT SHE HAD THE RIGHT TO HAVE AN IN-PERSON TRIAL PURSUANT TO DIRECTIVES #12-20 AND #06-21.

[POINT III]

THE TRIAL [JUDGE] ERRED IN CONCLUDING THAT [THE DIVISION] DEMONSTRATED BY CLEAR AND CONVINCING EVIDENCE THAT [THE SON'S] HEALTH AND DEVELOPMENT HAD BEEN OR WILL CONTINUE TO BE ENDANGERED BY THE PARENTAL RELATIONSHIP BECAUSE THE TRIAL [JUDGE] DID NOT MAKE A SINGLE FINDING THAT [THE MOTHER'S] ACTIONS OR INACTIONS HARMED [THE SON] OR PLACED HIM AT RISK OF HARM.

[POINT IV]

THE TRIAL [JUDGE] ERRED IN CONCLUDING THAT [THE DIVISION] DEMONSTRATED BY

8 <span>A-3282-20</span>

CLEAR AND CONVINCING EVIDENCE THAT [THE MOTHER] WAS UNWILLING OR UNABLE TO ELIMINATE THE HARM FACING [THE SON] OR IS UNABLE OR UNWILLING TO PROVIDE A SAFE AND STABLE HOME FOR HIM.

A. The Trial [Judge] Disregarded Facts Of Record That Demonstrate That COVID-19 Caused A Lack Of Available Housing And That [The Mother] Was Not Able To Use The Housing Voucher Given To Her. Temporary Poverty And Temporary Homelessness Caused By COVID-19's Effect On The Housing Market Does Not Prove [The Mother] Cannot Safely Parent [The Son].

B. During Approximately One Hundred Family Visits, [The Division] Documented The Happy Times Shared By The Mother And Son. No Parenting Issues Were Noted By [The Division]. These Undisputed Facts Prove That [The Mother] Can Eliminate Any Alleged Future Harm To [The Son].

[POINT V]

THE TRIAL [JUDGE] ERRED IN CONCLUDING THAT [THE DIVISION] DEMONSTRATED BY CLEAR AND CONVINCING EVIDENCE THAT IT MADE REASONABLE EFFORTS TO PROVIDE SERVICES TO HELP THE MOTHER CORRECT THE CIRCUMSTANCES WHICH LED TO HER SON'S PLACEMENT OUTSIDE THE HOME. [THE DIVISION'S] FAILURE TO PROVIDE HOUSING ASSISTANCE TO A PARENT WHO IS A SURVIVOR OF DOMESTIC VIOLENCE AND WHOM [THE DIVISION] DOCUMENTED WORKED FULL-TIME THROUGHOUT THE

COVID-19 PANDEMIC AS AN ESSENTIAL EMPLOYEE, SHOWS A LACK OF REASONABLE EFFORT AT PROVIDING SERVICES IN VIOLATION OF THE THIRD PRONG OF N.J.S.A. 30:4C-15.1(a).

[POINT VI]

THE TRIAL [JUDGE] ERRED IN CONCLUDING THAT [THE DIVISION] DEMONSTRATED BY CLEAR AND CONVINCING EVIDENCE THAT TERMINATION OF [THE MOTHER'S] PARENTAL RIGHTS WILL NOT DO MORE HARM THAN GOOD.

[POINT VII]

THIS MATTER SHOULD BE REVERSED AND REMANDED BECAUSE, EVEN IF NONE OF THE ERRORS COMMITTED BY THE TRIAL [JUDGE] WOULD SINGULARLY CONSTITUTE REVERSIBLE ERROR, THE ACCUMULATION OF ERRORS CONSTITUTES PLAIN ERROR CLEARLY CAPABLE OF CAUSING AN UNJUST RESULT.

In his related appeal, the father argues:

POINT I

THE TRIAL [JUDGE] ERRED WHEN [SHE] FOUND THAT [THE FATHER'S] PARENTAL RELATIONSHIP PRESENTED A SUBSTANTIAL RISK OF HARM TO [THE SON].

10

POINT II

THE TRIAL [JUDGE] ERRED WHEN [SHE] FOUND THAT [THE FATHER] WAS UNABLE OR UNWILLING TO MITIGATE THE HARM.

POINT III

THE TRIAL [JUDGE] ERRED IN FINDING THAT [THE DIVISION] PROVIDED REASONABLE SERVICES UNDER PRONG THREE.

> A. [The Division's] Efforts Were Not Reasonably Calculated To Reunify Father And Son.

> B. The Trial [Judge] Did Not Make Specific Findings With Regards To Alternatives To Termination Of Parental Rights.

POINT IV

THE TRIAL [JUDGE] ERRED WHEN [SHE] FOUND THAT TERMINATION OF PARENTAL RIGHTS WAS IN [THE SON'S] BEST INTEREST.[3]

We disagree and affirm substantially for the reasons given by the trial judge in her oral opinion.

### III.

We begin by addressing the mother's Points III, IV, V, and VI, and the father's Points I-IV, where they relatedly assert the trial judge erred in

---

[3] To comport with our style conventions, we have altered the capitalization of the mother's Points I to VII and the father's Points III.A and III.B but have omitted the alterations for readability.

terminating their parental rights to the son. They essentially contend that there is insufficient evidence as to each prong to support the judgment terminating their parental rights. The record, however, supports the judge's findings and conclusions.

A.

First Prong

The father contends that the trial judge erred in concluding his parental relationship to the son would endanger the child's safety, health, or development because the judge focused on the harm the father imposed onto the mother's other children. The mother contends that because the judge did not find that the mother harmed the child, the judge's conclusions were in error.

The first prong of the best interests test requires the Division demonstrate that the "child's safety, health, or development has been or will continue to be endangered by the parental relationship." N.J.S.A. 30:4C-15.1(a)(1); see K.H.O., 161 N.J. at 352. The concern is not only with actual harm to the child but also the risk of harm. D.M.H., 161 N.J. at 383. The focus is not on a single or isolated event, but rather on the effect "of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348. However, a judge does not need to wait "until a child is actually

12

irreparably impaired by parental inattention or neglect" to find child endangerment. D.M.H., 161 N.J. at 383. The Court has explained that a parent's withdrawal of nurture and care for an extended period is a harm that endangers the health of a child. Id. at 379. When children "languish in foster care" without a permanent home, their parents' failure to provide "a safe and stable home" may itself constitute harm. Id. at 383.

The judge detailed that the Division has been involved with this family for numerous years. At the time of the son's birth, both of the mother's other children were in the Division's care because of these concerns. Specifically, stemming from incidents of abuse from the father towards the mother's other children. The father physically abused the mother's elder son and allegedly sexually abused the mother's daughter. The judge characterized the harm caused as "a failure to protect at a fundamental level."

The mother knew of these incidents of abuse and did not intervene in any way and refused to acknowledge the harm caused. The incident of the elder son's abuse was only discovered after the child reported the abuse to his school. The father and mother, as far as the contextual circumstances, corroborated the child's statements. There was also an incident where the father kept his gun out and the elder son picked up the gun. The judge thus found it foreseeable "that a

13

child . . . might put their hands on a readily available unlocked and loaded gun kept underneath a couch in a home that [the child] lives in." The father also allegedly sexually abused the mother's daughter, which the mother was aware of and continually minimized its importance and concern.

The judge thus found that the parental relationship will harm or continue to harm the son. While these incidents relied upon concern the mother's two other children, a judge does not need to wait until a child is harmed. These circumstances presented a clear risk to the son. See D.M.H., 161 N.J. at 383. The substantiated evidence of the father's abuse and the mother's acquiescence to the father's abuse demonstrates there is no basis for us to disturb the judge's finding that the Division satisfied prong one against both the mother and father by clear and convincing evidence.

B.

Second Prong

The mother contends that the judge ignored COVID-19's impact on her search for housing and how that impacted her ability to provide a safe home for the son. The father contends that because he completed required tasks, like mandated drug testing and visitation, the judge erred in concluding he was unable to rectify or remedy the harm to the son. Both assertions are meritless.

The second prong of the best interest determination "in many ways, addresses considerations touched on in prong one." F.M., 211 N.J. at 451. Often, evidence supporting the first prong may also support the second prong. D.M.H., 161 N.J. at 379. This prong "relates to parental unfitness," K.H.O., 161 N.J. at 352, and "the inquiry centers on whether the parent is able to remove the danger facing the child," F.M., 211 N.J. at 451. The Division can satisfy this inquiry by showing the parent or parents cannot provide a safe and stable home and that the child or children will suffer substantially from a lack of stability and permanent placement. M.M., 189 N.J. at 281.

The judge concluded the mother expressed an "unwillingness to disclose to any helping authority." After the abuse committed by the father to her children, she refused to call the police, the Division, or any appropriate authority. The judge also determined because the mother was continuing a relationship with the father—where she was at least planning for a future with him—she did not take necessary steps to remedy any potential harm to the son. The judge thus concluded the mother is unable and unwilling to remedy the circumstances. And as to the father, based on the evidence and expert reports, the judge concluded that at this time the father was unfit to parent the son. The judge stated that some basics that the father could start are:

15

> not to be taking [the mother's] money; not to be secretly putting . . . her under his roof. And another basic would have been to let the Division in his home; to disclose his budget; to undergo the drug screens. And another basic would have been to behave much less appositionally during all of his visits with various . . . Division supervisors.

The father's dangerous behavior has created the potential harm to the son and the mother has not separated herself from this behavior. The mother completed a domestic violence shelter workshop, but she may have compromised the shelter's security by maintaining contact with the father. The shelter required the mother to move out after she exceeded the usual timeframe of thirty to forty-five days and stayed for more than seven months. She was then provided with a housing voucher and alternative housing options, which she did not use within the voucher's year-long deadline. Shelter staff reported that the mother failed to find housing and the voucher was given to another shelter resident. Thereafter, the mother moved back in with the father. She further entrenched herself into this dangerous and unsafe situation. Thus, the record clearly supports the judge's conclusions that she, and the father, have not tried to better the environment for the son.[4]

---

[4] We note in the supplemented record, the mother applied for and received a temporary restraining order (TRO) from the father on February 28, 2022. While

C.

Third Prong

The mother's argument, much like her argument for prong two, is that the trial judge ignored COVID-19's impact on her efforts to find safe housing. The father contends that the judge did not make specific findings of fact to the father's individualized case and that the Division's plans were not reasonably calculated to reunify the father and the son. And that because the father was never actually convicted of the sexual assault allegations, they should not be used against him. But these assertions are without merit.

The third prong requires evidence that "[t]he [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the [judge] has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). "Reasonable efforts may include consultation with the parent, developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress,

we recognize that this demonstrates a step to separate herself from the father, the fact that the mother obtained the TRO several months after the guardianship judgment was filed does not support her argument that the judge abused her discretion in finding the mother was unfit to parent when the judgment was entered.

and facilitating visitation." M.M., 189 N.J. at 281 (internal quotation marks and citations omitted).

Here, the Division offered the mother and father psychological and bonding evaluations, supervised visitation, parenting classes, domestic violence counseling, and anger management classes. Outside of the drug treatment program, the mother was generally non-compliant. Shelter staff attempted to work with her to secure housing, but she failed to use the voucher to find housing and instead moved back in with the father. And, as far as familial alternatives for the son's placement, the mother did not provide any names.

As for the father, he was also generally non-compliant with the services provided and was, often times, outright antagonistic to the Division's attempts to help. He argues that the services provided essentially considered him a sex offender without any convictions; however, as the judge stated the allegations were "real and concrete" and the Division accordingly limited the contact the father could have with the other children. As established in the record, the Division has clearly made reasonable efforts to provide services to the parents, which were either unmet or disregarded. The judge's prong three findings are supported by sufficient credible evidence.

D.

Fourth Prong

The father contends that because of the bond he and the son have, the son will be emotionally harmed by the termination of the father's parental rights. The mother similarly asserts that termination of her parental rights would emotionally harm the son because of her bond with him.

The fourth prong of N.J.S.A. 30:4C-15.1(a)(4) serves as "a 'fail-safe' inquiry guarding against an inappropriate or premature termination of parental rights." F.M., 211 N.J. at 453.

> [T]he fourth prong of the best interests standard cannot require a showing that no harm will befall the child as a result of the severing of biological ties. The question to be addressed under that prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with [his or] her natural parents than from the permanent disruption of [his or] her relationship with [his or] her foster parents.
>
> [K.H.O., 161 N.J. at 355.]

"The crux of the fourth statutory subpart is the child's need for a permanent and stable home, along with a defined parent-child relationship." N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 226 (App. Div. 2013). "If one thing is clear, it is that the child deeply needs association with a nurturing adult. Since

19

it seems generally agreed that permanence in itself is an important part of that nurture, a court must carefully weigh that aspect of the child's life." A.W., 103 N.J. at 610. Therefore, "to satisfy the fourth prong, the State should offer testimony of a 'well[-]qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation' of the child's relationship with both the natural parents and the foster parents." M.M., 189 N.J. at 281 (quoting In re J.C., 129 N.J. 1, 19 (1992)).

The Division presented testimony from psychologist, Doctor James L. Loving, Psy.D. Dr. Loving testified that both the father and mother are unfit to parent. He opined that returning the son to the father would create a "gravely dangerous situation," and that the mother was currently unable to provide a safe, stable, and predictable home and would remain unable for the foreseeable future. He went on to opine that the son is not securely bonded to either the father or mother, and that "there's every reason to think that [the son] would continue to thrive even if he did not have contact with" the mother or father.

The judge weighed the expert testimony presented. The expert had the opportunity to conduct bonding evaluations between the mother, the father, and the son, as well as between the son and his resource parents. The judge acknowledged, throughout the oral opinion, that there is a bond between the

mother and son, but the son cannot achieve permanency with the mother. And as to the father, the judge found that there is no real parental relationship between the father and son. In contrast, the judge emphasized the relationship between the son and resource parents, which supports the son's need for permanency. The record supports the judge's findings under prong four.

IV.

Finally, the mother contends (1) the judge used the improper legal standard; (2) there was ineffective assistance of counsel; and (3) the cumulative errors of the trial judge constituted plain error clearly capable of causing an unjust result.

A.

While she is correct that "one parent cannot be held responsible for the shortcomings of the other" in terminating parental rights, the trial judge here adequately assessed the mother independent of the father's shortcomings. N.J. Div. of Youth & Fam. Servs. v. M.M., 382 N.J. Super. 264, 282 (App. Div. 2006), rev'd on other grounds, 189 N.J. 262 (2007). The trial judge made distinct findings for both the father and mother with respect to the termination of their parental rights. There are no grounds to find the trial judge used the incorrect legal standard.

B.

The mother contends that her counsel was ineffective because she provided a list of witnesses that her attorney failed to call, and that her attorney failed to advise her that an in-person trial was possible.

A defendant in a termination of parental rights case has a constitutional right to effective assistance of counsel. N.J. Div. of Youth & Fam. Servs. v. B.R., 192 N.J. 301, 306 (2007). Claims of ineffective assistance in this context are assessed under the two-prong standard governing collateral challenges to criminal convictions enumerated in Strickland v. Washington, 466 U.S. 668 (1984), which our Court adopted in State v. Fritz, 105 N.J. 42, 58 (1987). Under Strickland, to establish a prima facie case that her counsel provided ineffective assistance, defendant must establish (1) her counsel's performance was deficient and counsel made errors so serious that counsel was not functioning as guaranteed by the Sixth Amendment, and (2) defendant was prejudiced such that there existed a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. 466 U.S. at 687, 694.

The B.R. Court also declared that claims of ineffective assistance of counsel in termination of parental rights cases should be raised on direct appeal, and in many cases will be resolvable on the appeal record alone. 192 N.J. at

310-11. The Court presumed that claims of ineffective assistance may be resolvable without an evidentiary hearing if, for example, "the panel accepts as true appellant's representations regarding the lawyer's shortcomings but determines, on the basis of the full record, that the outcome would not have changed." Id. at 311.

We are unpersuaded, viewing the record as a whole, that but for the claimed shortcomings in counsel's performance, there is a reasonable probability the result would have been different had counsel provided the witnesses listed in the mother's certification or proceeded with an in-person trial. The record shows the severity of the situation and that the mother was unfit to parent. The Division provided an array of services well before the son's birth that had little to no effect in providing a safer home. Based on the record, the mother cannot establish it was reasonably probable that the result would have been different but for her counsel's alleged ineffectiveness.

C.

The mother finally alleges that even if none of the errors alleged would singularly constitute reversible error, in accumulation, the errors constitute plain error clearly capable of causing an unjust result.

23

The doctrine of cumulative error recognizes that "although an error or series of errors might not individually amount to plain error, in combination they can cast sufficient doubt upon the verdict to warrant reversal." State v. Reddish, 181 N.J. 553, 615 (2004). Our Court has stated that "the predicate for relief for cumulative error must be that the probable effect of the cumulative error was to render the underlying trial unfair." State v. Wakefield, 190 N.J. 397, 538 (2007). However, we find no error in the trial judge's decision. We thus conclude this contention is meritless.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION