946 A.2d 62 (2008)
400 N.J. Super. 77
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
I.Y.A., Defendant-Appellant.
In the Matter of the Guardianship of T.L. and K.L., Minors.
No. A-2994-06T4.
Superior Court of New Jersey, Appellate Division.
Argued February 11, 2008.
Decided April 30, 2008.
*63 Patricia Nichols, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Thomas G. Hand, Designated Counsel, of counsel and on the brief).
*64 Andrea M. Silkowitz, Assistant Attorney General, argued the cause for respondent (Anne Milgram, Attorney General, attorney; Ms. Silkowitz, of counsel and on the brief).
Melissa R. Vance, Assistant Deputy Public Defender, argued the cause for minors T.L. and K.L. (Yvonne Smith Segars, Public Defender, Law Guardian, attorney; Ms. Vance, on the brief).
Before Judges LINTNER, GRAVES, and ALVAREZ.
The opinion of the court was delivered by GRAVES, J.A.D.
Defendant I.Y.A. is the mother of two sons: T.L. (fictitiously, Tyler), born on July 19, 1994, is now thirteen years old, and K.L. (fictitiously, Kevin), born on January 25, 2000, is now eight years old. I.Y.A. appeals from a fact-finding order entered on November 27, 2006, memorializing the trial court's determination that she "abused or neglected" her children, and a final order entered on December 11, 2006, terminating the protective services litigation and awarding custody of the children to their father, J.L., who resides in Korea.
On appeal, I.Y.A. argues:
POINT I
THE PROCEEDINGS BELOW VIOLATED DEFENDANT'S CONSTITUTIONALLY PROTECTED RIGHTS, DID NOT COMPORT WITH STATUTORY REQUIREMENTS, AND DID NOT RELY UPON COMPETENT, CREDIBLE, ADMISSIBLE EVIDENCE.
POINT II
THE FACT-FINDING HEARING DID NOT COMPORT WITH STATUTORY REQUIREMENTS AND WAS HOPELESSLY INFECTED BY PRIOR PROCEEDINGS THAT DID NOT COMPORT WITH STATUTORY REQUIREMENTS.
POINT III
THE TRIAL COURT'S FINDING OF ABUSE OR NEGLECT WAS WRONG AND MUST BE REVERSED.
POINT IV
DYFS FAILED TO PROVIDE REASONABLE SERVICES TO I.Y.A.
POINT V
DISMISSAL OF THE CASE WAS IMPROPER.
POINT VI
THIS MATTER MUST BE REMANDED TO A NEW TRIAL JUDGE.
POINT VII
THIS MATTER MUST BE REMANDED TO A NEW LAW GUARDIAN.
POINT VIII
THIS MATTER MUST BE REMANDED TO A NEW ATTORNEY GENERAL.
POINT IX
THIS MATTER MUST BE TURNED OVER TO THE UNITED STATES ATTORNEY[']S OFFICE.
POINT X
I.Y.A. WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.
Based on our review of the record and the applicable legal standards, we conclude the evidence presented during the fact-finding hearing conducted on August 23 and November 27, 2006, is insufficient to support the determination that I.Y.A. abused or neglected her children. We also agree the protective services litigation should not have been terminated on December 11, 2006, after the father, J.L., returned to Korea with the children in violation of court orders entered on May 8, May 18, and June 8, 2006.
*65 On April 25, 2006, the Division of Youth and Family Services (the Division) filed a verified complaint and order to show cause alleging Tyler and Kevin required "the protection, care and supervision of the Division." In its complaint, the Division stated its initial contact with I.Y.A. occurred on October 12, 2004, when it received a referral from the Glenpointe Marriott Hotel in Teaneck indicating the cleaning staff found Kevin alone in a room. I.Y.A. told the Division caseworker Kevin was alone for about two and one-half hours, and she said it was the first time she left Kevin alone in the hotel room.
During its investigation, the Division learned from I.Y.A. that she obtained a divorce from J.L. in 2000, and she had a domestic violence final restraining order against him. According to I.Y.A., she owned an import/export business with J.L. prior to their divorce, but he "left the country with the money while she was left with the debt." On September 3, 2002, I.Y.A. obtained a judgment against J.L. in the amount of $2.9 million, representing "arrears from the date of the divorce through August 2002." The Division also learned I.Y.A. and the children were living at the Marriott Hotel for approximately two months.
Based on its investigation, the Division substantiated neglect and I.Y.A. signed a case plan agreeing to fully cooperate with the Division. On July 9, 2005, the Division closed the case "because [I.Y.A.] cooperated with counseling at the Bergen Family Center, became connected with the Korean Love Center, completed parenting skills training and had not left the children home alone on another occasion."
The next referral occurred on April 21, 2006, when the children's school principal advised the Division the children were concerned for their safety because their mother claimed they "were in danger and could be kidnapped." According to the principal, I.Y.A. had seen a psychologist who concluded she was "paranoid and delusional." But the caller also reported I.Y.A. had "undergone psychiatric screening" at the Holy Name Hospital on April 20, 2006, and she "was not found to be a danger to herself or others."
In response to this referral, Division caseworker Lydia Tosacowa (Tosacowa) went to the Marriott Hotel in Teaneck at approximately 7:00 p.m. on Friday, April 21, 2006, to determine "whether [I.Y.A.] was delusional." The hotel manager escorted Tosacowa to I.Y.A.'s room and Tyler opened the door. Tosacowa observed the children "eating chicken fingers and french fries that the hotel had delivered to the room." I.Y.A. then "got into bed and stated that she did not feel well." Tosacowa informed I.Y.A. of the referral and asked if she could talk to the children privately. I.Y.A. said no. "She advised . . . she was tired and was going to take a nap." She asked Tosacowa to wait in the lobby until she woke up. Tosacowa explained she could not wait because she was on-call, and she promised to conduct her investigation as quickly as possible. At that point I.Y.A. "got up from the bed and grabbed both boys and brought them into bed with her. She was holding onto them for dear life. Worker asked again can she speak to the boys privately. [I.Y.A.] said no and asked the worker to leave the room."
Tosacowa then contacted the Psychiatric Emergency Screening Program (PESP), a crisis care organization, which provides emergency mental health evaluations. A PESP worker, accompanied by two police officers, arrived forty-five minutes later and, at Tosacowa's insistence, I.Y.A. cooperated with the worker. I.Y.A. refused, however, to answer mental health questions posed by the PESP worker, and *66 ultimately asked the worker, the police officers, and Tosacowa to leave. Based upon I.Y.A.'s resistance, the PESP worker instructed the police to take I.Y.A. to Bergen County Regional Medical Center (the Medical Center). After the police officers explained she was going to be involuntarily committed, I.Y.A. started clinging to the children and refused to put on her coat or shoes. The police handcuffed and removed her. Tosacowa observed the boys to be "very frightened" and they "[s]tarted crying, started screaming" during their mother's removal.
I.Y.A. was hospitalized at the Medical Center's psychiatric unit from April 21 until April 26, 2006. On April 25, 2006, while I.Y.A. was hospitalized, the court granted the Division's request for custody, care, and supervision of the children, and an order to show cause, returnable May 8, 2006, was issued. During the hearing on May 8, 2006, the children's Law Guardian advised the court as follows: "Your honor, my clients are 11 and 6 years old, they were born here in the United States, they are [Americanized]. They've indicated that they do not wish to return to Korea. . . . I . . . ask that the . . . father not be allowed to take my clients to Korea. . . ." Accordingly, while legal and physical custody of Tyler and Kevin was transferred to J.L. (who had returned to New Jersey from Korea for the proceeding), the court specifically instructed J.L. that he was not "permitted to remove [the children from] the state of New Jersey."
On May 18, 2006, the court temporarily suspended I.Y.A.'s supervised visitation after she yelled at both a Division worker and J.L. prior to a visitation session at a Division office. The court, however, continued its order prohibiting J.L. from taking the children out of New Jersey "pending further order of the [c]ourt." During the hearing on May 18, 2006, counsel for I.Y.A. asked the court to hold the children's passports to ensure J.L. would not take them out of the country, but the court denied the request, reasoning as follows: "I'm not going to hold the passports . . . because at this time [J.L.] still doesn't have the ability to go pursuant to this particular court order. But I will sign an order permitting him to secure those passports."
During the next hearing, on June 8, 2006, the Division's attorney asked the court to dismiss the protective services litigation and to allow J.L. to remove the children to Korea: "[J.L.] has told the Division and this [c]ourt that business matters and family matters in Korea mean that he cannot stay here indefinitely. He must return to Korea and he wants to do that with his boys." This application was opposed by both I.Y.A. and the Law Guardian, who advised the court that the children did not want to go to Korea:
[Tyler] indicated to me that he's been living in a hotel since [he was] about six years old [and] he's going to be 12 in July. . . . [Tyler] indicated that the father had left the United States five years ago and also the last time [Tyler] was in Korea was five years ago.
He indicated that the father visits him in the United States approximately one or two times a year. He doesn't have a particularly close relationship with his father; however, he is very, very close to his mother.
He expressed to me great concern of not seeing his mother. He misses her desperately. And he asked me to tell the judge that he does not want to go to Korea. He considers himself American. He has no interest in going to Korea. He's very concerned that he doesn't speak or write in . . . Korean. He's not close to the relatives in Korea. He has *67 numerous friends here and loves the school.
[Kevin] is six years old. He appeared well groomed, very well taken care of. He said to me, "the last time I saw my father before he came just recently was 10,000 years ago." He says he doesn't ever remember living in a home. He always remembers living in a hotel.
He cares deeply for his mother. He's very concerned about not seeing his mother. Both boys expressed concern that if they go to Korea, their mother would not be able to come. . . .
. . . .
[Kevin] and [Tyler] both indicated that they really choose to stay with their mother and they have no interest in going to Korea.
. . . .
[Tyler] indicated that the mother would cook for the children from time to time in the hotel room. She had a rice cooker, a microwave. She would make special Korean dishes for them.
Your honor, there's a very strong bond between these boys and their mother. And I would submit to the [c]ourt that although the father does visit them sporadically, they really don't feel close to him. And their concern is that they don't want to lose contact with their mother. They're upset that they don't visit with their mother. And they want to be raised as Americans. They love the culture here. They know nothing about the Korean culture. They were born here. And both of them have asked me to tell you that they want to stay here.
The court denied the application to dismiss the litigation, reasoning as follows:
The children appear to be properly clothed, properly fed, and good students at a private education facility.
The judgment of divorce that was presented to me makes clear . . . that [J.L.] had . . . given [I.Y.A.] exclusive legal and physical custody . . . of the children . . . predicated on prior violence and . . . [he waived] all visitation rights with respect to the children.
But. . . . [h]e has had some parenting time with them on a yearly or maybe a twice yearly basis. And while he may have not complied with the terms of the final judgment of divorce, he has been consistently supporting the children and [I.Y.A.] so that they have been able to continue to reside in the [Glenpointe], be clothed, take a car service to school, and continue to attend a parochial school.
I am not going to permit a dismissal of this action at the present time. Though I think it is safe that the children remain in the temporary care and custody of their father, I am not satisfied that sufficient efforts have been made to allow psychiatric and psychological intervention on behalf of the mother who has been the custodial parent for the last several years.
In an order entered the same day, June 8, 2006, I.Y.A.'s visitation rights remained "temporarily suspended" and J.L. was prohibited from removing the children from "the state of New Jersey pending further order of the [c]ourt."
Nevertheless, three days later, on June 11, 2006, J.L. returned to Korea, taking Tyler and Kevin with him. During an emergent hearing on June 29, 2006, J.L. was found in contempt of court and ordered "to immediately return the children to the State of New Jersey." During the hearing, the Law Guardian again stressed the boys "were very adamant" about "not want[ing] to go [to] Korea."
By the next hearing on July 28, 2006, J.L. still had not produced the children in New Jersey. Nonetheless, the Law *68 Guardian, without having spoken to the children, recommended to the court that the children be allowed to remain in Korea on a temporary basis:
I'm recommending to the [c]ourt that my clients remain in Korea. I believe . . . they will be sent to an . . . international school, in Korea, and I'm hoping that they will adjust to staying in Korea. And if and when the mother is able to care for them they would be able to return back to the United States.
The case management review order entered on July 28, 2006, (1) allowed J.L. "to temporarily remain in Korea with the minor children pending mother's compliance with all Division recommendations for services," (2) found J.L. was "in contempt of the [c]ourt's order of 6/8/06" for removing the children to Korea, (3) required J.L. "to show cause why he should not be sanctioned for his contempt of the court's order," (4) required I.Y.A. "to engage in psychiatric treatment and medication monitoring at Bergen Regional Medical Center or another . . . Division approved facility," and (5) ordered J.L. "to pay for [I.Y.A.] to travel to Korea if she chooses to have supervised visitation with the minors, not less than bi-monthly."
The fact-finding hearing to determine whether I.Y.A. abused or neglected her children took place on August 23 and November 27, 2006, while the children and their father were in Korea. The only witnesses to testify during the hearing were two caseworkers who testified on behalf of the Division. On August 23, 2006, Nicole Spizo testified regarding the referral received from the children's school principal on April 21, 2006, as well as I.Y.A.'s involuntary hospitalization, but she did not know the reason for the hospitalization. On November 27, 2006, Tosacowa testified concerning the events that transpired at I.Y.A.'s hotel room on April 21, 2006, the day I.Y.A. was involuntarily hospitalized, which we previously recounted.
On November 27, 2006, the trial court determined I.Y.A. "abused or neglected" her children by a preponderance of the evidence. On December 11, 2006, the protective services litigation was terminated. This appeal followed.
Abuse and neglect proceedings are brought under N.J.S.A. 9:6-8.21 to -8.73, collectively known as Title 9. N.J.S.A. 9:6-8.21(c) defines abuse or neglect as follows:
c. "Abused or neglected child" means a child less than 18 years of age whose parent . . . (1) inflicts or allows to be inflicted upon such child . . . protracted impairment of physical or emotional health . . . (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent . . . to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care . . . or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof.
[N.J.S.A. 9:6-8.21(c).]
See, e.g., G.S. v. Dep't of Human Servs., 157 N.J. 161, 182-83, 723 A.2d 612 (1999) (substantiating neglect upon showing mother "disregarded the substantial probability that harm would result from" administering her child an overdose of prescription medication); Div. of Youth & Family Servs. v. G.M., 398 N.J.Super. 21, 26, 939 A.2d 239 (App.Div.2008) (substantiating abuse where intoxicated mother grabbed her daughter "and pulled her shirt causing her to choke and vomit"); N.J. Div. of Youth & Family Servs. v. A.C., 389 N.J.Super. 97, 114, 911 A.2d 104 (Ch. Div.2006) (substantiating neglect *69 where mother's "assertion of ignorance" as to child's fractured skull was not credible).
Pursuant to N.J.S.A. 9:6-8.46(b): "In a fact-finding hearing (1) any determination that the child is an abused or neglected child must be based on a preponderance of the evidence and (2) only competent, material and relevant evidence may be admitted." See, e.g., N.J. Div. of Youth & Family Servs. v. S.S., 372 N.J.Super. 13, 24, 855 A.2d 8 (2004) (The State must "demonstrate by a preponderance of the competent, material and relevant evidence the probability of present or future harm."), certif. denied, 182 N.J. 426, 866 A.2d 983 (2005) (internal citation omitted). A "fact-finding hearing is a critical element of the abuse and neglect process," because the court's "determination has a profound impact on the lives of families embroiled in this type of a crisis." N.J. Div. of Youth & Family Servs. v. J.Y., 352 N.J.Super. 245, 264-65, 800 A.2d 132 (App. Div.2002). Moreover, the fact-finding hearing is "a significant and necessary check on the actions of DYFS." S.S., supra, 372 N.J.Super. at 24, 855 A.2d 8. Accordingly, the fact-finding hearing must be conducted "with scrupulous adherence to procedural safeguards." N.J. Div. of Youth & Family Servs. v. A.R.G., 179 N.J. 264, 286, 845 A.2d 106 (2004).
In the present matter, the entirety of the court's decision substantiating "abuse or neglect" was as follows:
The [c]ourt has heard testimony in this case on two separate days. I heard the testimony of Nicole Spizo, who was the case worker involved in this, and also today Lydia [Tosacowa] . . . with respect to the removal on April 21st.
The [c]ourt does find by a preponderance of the evidence that the Defendant, [I.Y.A.], abused or neglected the children. This was not the first time the Division was involved with the family. The referral came from a principal at the children's school as a result of the children making statements that they were in fear for their safety based upon the actions of their mother telling them that someone was either after them or [was going] to harm them.
The family had been residing in a hotel for what appears to be a period of approximately three years. While the boys may not have been home with their mother during the course of the day and were, in fact, attending school[ ] and doing well, this is a case where it appears that both of these children were parentified to this [c]ourt. They were caring for their mother when they returned from school. They were permitted very, very limited social access to other children outside the context of school. They were, in essence, locked up in the room at the Marriott. And while it may be a nice hotel, having two children share a king size bed with their mother, who clings to them and must be literally picked up and removed from the room, refusing to put on shoes, refusing to put on a jacket and taking these children into a king size bed with her and holding them, is clearly enough to place fear in the children.
The mother was taken to Bergen Regional Medical Center during the [Dodd] removal and was committed to Bergen Regional for a period of time thereafter. And while the records are not here as to the exact diagnosis, there is no question that she . . . [was] kept on an involuntary commitment. And the [c]ourt can take judicial notice of the fact that . . . the involuntary commitment will call for a psychiatric evaluation and will call for a psychiatric diagnosis. Otherwise, she would not have been maintained there.
I find that the removal was appropriate under all circumstances and that the *70 children were at risk of abuse or neglect and it was repeated . . . for an extended period of time.
I'll sign the Order.
"The scope of appellate review of a trial court's fact-finding function is limited. The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12, 713 A.2d 390 (1998) (citing Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974)). Trial courts hear the case and see the witnesses, and they are in a better position to evaluate the credibility and weight to be afforded testimonial evidence. In re Guardianship of D.M.H., 161 N.J. 365, 382, 736 A.2d 1261 (1999); Pascale v. Pascale, 113 N.J. 20, 33, 549 A.2d 782 (1988). On the other hand, deference is not appropriate if the trial court's findings are "so wide of the mark that the judge was clearly mistaken." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605, 926 A.2d 320 (2007).
In this case, we conclude from our review of the record that the competent, material, and relevant evidence is insufficient to sustain the court's determination that I.Y.A. abused or neglected her children. Although the court relied on the referral the Division received from the children's school principal indicating the children were told by their mother that someone might harm them, the principal did not testify at the fact-finding hearing, and the Division's attorney conceded the statements attributed to the principal were only offered for the limited purpose of explaining why the Division initiated its investigation. Nevertheless, the Division was also allowed to introduce "information the school shared" regarding the results of a psychological evaluation that was never produced or offered into evidence:
Q. [MS. ZEC  COUNSEL FOR THE DIVISION]: Can you please tell us about the next referral that was received regarding this family?
A. [MS. SPIZO  DIVISION CASEWORKER] . . . [I]n April 2006, the Division received a referral from the boys' principal at their school stating that 
MR. PREZIOSI [COUNSEL FOR I.Y.A.]: Objection to what any other third party stated, Judge.
. . . .
MS. ZEC: Your Honor, it's not being submitted for the truth of the matter asserted. It's being submitted to show the [c]ourt what the information was that the Division received and why we had to initiate an investigation.
THE COURT: It's overruled. Go ahead.
A. Just stating that [I.Y.A.] . . . had a theory that somebody was after her and her children and he wasn't sure if it was true or not. So, he sent her for a psychological evaluation which came back stating that 
MR. PREZIOSI: I would object to repeating what the psychological examination findings were when that person's report has never been supplied. And although I understand the Division may indicate that it's not being offered for the truth of the matter, it is  I would indicate to the [c]ourt, under the circumstances, it is highly prejudicial to my client.
MS. ZEC: Your Honor, all the Division worker is relaying is the information contained in the referral. Again, it is not being submitted for the truth of the matter asserted. We're only relaying to the [c]ourt the information that was received that caused the Division to initiate an investigation.

*71 THE COURT: And the psychological report was part of that information received?
MS. ZEC: The information that the school shared was that [I.Y.A.] had received [a] psychological evaluation and she was supposed to be receiving treatment.
THE COURT: Okay. Go Ahead.
MS. ZEC: That's the information that the Division received.
THE COURT: The objection is overruled. Go ahead.
. . . .
Q. Right, right, right. Please tell us everything that the referent reported to the Division.
A. The psychiatrist felt that her paranoia about someone trying to take her children or kidnap her children was delusional. And he questioned her ability to care for the children.
[(Emphasis added).]
Our courts have remanded for further fact-finding proceedings when "the attorneys `were permitted to make material factual representations that were then accepted by the court in lieu of sworn testimony from witnesses.' A proceeding 'conducted with [this level of] informality and general lack of adherence to fundamental evidentiary rules' is inadequate." G.M., supra, 398 N.J.Super. at 38, 939 A.2d 239 (quoting J.Y., supra, 352 N.J.Super. at 268, 800 A.2d 132) (alteration in original) (citation omitted). Moreover, although reports or evaluations by the Division "or affiliated medical, psychiatric, or psychological consultants" are admissible hearsay, they must be "prepared from [the author's] own first-hand knowledge of the case. . . . [A]nd no conclusion should be received unless the report contains a statement of the facts or procedures upon which it is based." In re Cope, 106 N.J.Super. 336, 343-44, 255 A.2d 798 (App. Div.1969).
Here, the Division's attorney represented to the court that I.Y.A. was in need of treatment based on a "psychological evaluation" that was never produced. Similarly, caseworker Spizo was allowed to testify regarding medical conclusions attributed to the same unidentified psychologist, even though that person, who was not a Division consultant, did not testify at the fact-finding hearing. Thus, the representations by counsel and the testimony by caseworker Spizo regarding the results of a "psychological evaluation" were unreliable and inadmissible. Accordingly, any reliance by the court on these statements, which lacked substantive value, or the statements of the principal, which were not offered for their truth, was improper and, as noted by I.Y.A.'s attorney, "highly prejudicial."
Additionally, there is insufficient evidence in the record to support the court's conclusion "that both of these children were parentified." The concept of parentification is largely absent from this State's case law, and there is no "uniformly accepted definition in the court system or in psychological reference materials." Bonnie L. Christner, Child Custody-Modification: Parentification of an Older Sibling Babysitting a Younger Sibling, 78 N. Dak. L.Rev. 785, 806 (2002). Broadly speaking, parentification is defined as a "functional and/or emotional role reversal in which the child sacrifices his or her own needs for attention, comfort, and guidance in order to accommodate and care for the logistical or emotional needs of the parent." Burdened Children, Theory Research, & Treatment of Parentification 5 (Nancy D. Chase ed., 1999). "Parentification occurs in many dependency situations: alcoholism, mental illness, addiction, and sexual abuse among others. When a child is parentified, the child assumes the role of the *72 parent including that of protector instead of the other way around." Paul Bennett, Secret Reflections: Some Thoughts About Secrets and Court Processes in Child Protection Matters, 45 Ariz. L.Rev. 713, 728 (2003) (citing Burdened Children, supra, at 5-6).
Furthermore, in child custody, termination of parental rights, and abuse or neglect proceedings, a determination that children are parentified is generally based on expert testimony or reports. See, e.g., N.J. Div. of Youth & Family Servs. v. M.M., 382 N.J.Super. 264, 277, 888 A.2d 512 (App.Div.2006) ("[T]he Division's expert, Dr. Dyer, had evaluated [C.M.] as a `parentified child,' . . . `based primarily upon [C.M.]'s need to accommodate the limitations of her mother in general and specifically in the household.'"), rev'd, in part on other grounds, 189 N.J. 261, 914 A.2d 1265 (2007) (last alteration in original); In re Woodman, 342 Or. 76, 149 P.3d 1124, 1127-28 (2006) (Dr. Sweet, a psychologist, concluded the "child was `parentified,' meaning that child believed that she had to take care of her mother"); Linker-Flores v. Ark. Dep't of Human Servs., 364 Ark. 224, 217 S.W.3d 107, 110 (2005) (Dr. Janice Church, the therapist for the child, L.L., and her mother testified the mother "saw herself as a victim and was unable to put her children's needs above her own. She further testified that L.L. took the role of a `parentified child' with her younger siblings."); In re Brea B., 75 Conn.App. 466, 816 A.2d 707, 711 n. 2 (2003) (noting a therapist who was an expert in the areas of childhood, adolescent and developmental psychology "described the child as `parentified,' a situation that results when a child is induced to take on parental responsibilities"); Cloutier v. Lear, 691 A.2d 660, 662 (Me.1997) (noting the counselor and therapist who had spent time with two children testified the oldest child "had an adult-to-adult relationship with" her mother and was at risk of "`parentification'").
In the present matter, the court determined the children were parentified based, apparently, on Tosacowa's testimony regarding statements made to her by the children:
And basically [Kevin] explained that mom sleeps all day and that she's quite often sick and that they take a taxi to school and back home. And that they eat dinner there at the hotel and that they don't go out very often.
. . . [Tyler] indicated that mom thought that someone was out to hurt them and that mom was very overprotective for that reason so they couldn't have many play dates or that they weren't able to go out of the hotel room very often because someone was going to take them away and . . . kidnap them and that someone was out to kill them.
. . . .
[Tyler] indicated also that she sleeps all day, that they do take [taxies] to and from school, that they are provided the[ir] meal[s] at the hotel, that their father basically paid for everything.
But no psychological evaluation of the children was performed, no expert testimony was proffered by the Division, and the children, who had been taken to Korea at the time of the hearing, were unavailable to testify. Moreover, the court's finding is contradicted by statements the children made to the Law Guardian as well as the Division's records. As previously noted, Tyler told the Law Guardian his mother had a rice cooker and microwave, and she would sometimes "make special Korean dishes for them." Additionally, in a report submitted to the court, the Division noted the children attended after school programs until 6:00 p.m. on a daily basis  leaving little time for the after school care *73 of their mother. And it is undisputed the children were doing well in school, they had no physical ailments or injuries, and they both told the Division caseworker and the Law Guardian they wanted to remain with their mother.
Finally, although I.Y.A. was involuntarily hospitalized at the Medical Center between April 21 and April 26, 2006, the Division presented no expert testimony and proffered no expert medical report with respect to I.Y.A.'s diagnosis, or "its potential impact on her ability to parent the children." J.Y., supra, 352 N.J.Super. at 252, 800 A.2d 132. In other circumstances, we have found hospitalization alone is not sufficient to sustain a finding of abuse or neglect. Cf. id. at 263, 800 A.2d 132 ("The event triggering DYFS involvement, J.Y.'s hospitalization, is totally lacking in crucial details and does not, on its face, support a finding of abuse or neglect within the meaning of N.J.S.A. 9:6-8.21(c)."); see also In re Moises D., 128 A.D.2d 775, 513 N.Y.S.2d 476, 477-78 (1987) (noting "past deficiencies and psychiatric hospitalizations do not, by themselves, establish neglect or unfitness," but ultimately holding expert testimony presented was sufficient to support "a substantial probability of neglect" if children were released to the parents); In re Jamie M., 134 Cal.App.3d 530, 184 Cal. Rptr. 778, 784 (1982) ("Harm to the child cannot be presumed from the mere fact of mental illness. . . . The proper basis for a ruling is expert testimony giving specific examples of the manner in which the mother's behavior has and will adversely affect the child or jeopardize the child's safety.").
Of course, a psychiatric disability can render a parent incapable of caring for his or her children. See, e.g., N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J.Super. 418, 439, 782 A.2d 458 (App. Div.2001), certif. denied, 171 N.J. 44, 791 A.2d 222 (2002). In that case, we affirmed an order terminating a mother's parental rights to her son because the expert medical testimony clearly established the mother's lengthy history of mental illness prevented her from raising her son. Id. at 424, 782 A.2d 458. In the present matter, unlike in A.G., there was no medical evidence to establish I.Y.A. suffered from a mental illness that prevented her from adequately parenting her children.
The only competent, material, and relevant evidence before the court suggests that I.Y.A. became "hysterical" and "started clinging on[to] the children" when the police removed her from the hotel on April 21, 2006. During this ordeal the children "were very frightened" and "[s]tarted crying, started screaming." The Division did not present expert testimony or evidence to demonstrate the forceful removal of I.Y.A. from the hotel room posed a substantial risk of harm to the children and, in our view, this incident alone does not support a finding of abuse or neglect under N.J.S.A. 9:6-8.21(c)(4). Cf. S.S., supra, 372 N.J.Super. at 22, 855 A.2d 8 ("Our concern with the court's rationale lies in the fact that emotional harm to the child as the result of witnessing domestic abuse was assumed by the DYFS case worker, . . . and by the fact-finding judge.").
In abuse and neglect hearings "it is of great importance that the evidence upon which judgment is based be as reliable as the circumstances permit and that the answering parent be given the fullest possible opportunity to test the reliability of the [Division's] essential evidence by cross-examination." In re Cope, supra, 106 N.J.Super. at 343, 255 A.2d 798. Given the record as it existed before the trial court, we are satisfied the Division failed to prove by a preponderance of the evidence that I.Y.A. jeopardized her children's *74 physical, mental, or emotional health.
Additionally, while we acknowledge our colleagues held in N.J. Div. of Youth & Family Servs. v. R.G., 397 N.J.Super. 439, 442, 937 A.2d 1013 (App.Div.2008), "that a permanency hearing is not required prior to placing a child in the physical custody of the non-abusive parent and dismissing the litigation," we are persuaded the reasoning in the more recent decision of G.M. is better suited to the present matter. In G.M. we held "notions of fundamental fairness and the best interests of the child require[d]" that:
[B]efore termination [of Title 9 litigation] was permitted by the court, the judge needed to decide whether 1) the children's best interests were served by their continued residence with the original custodial parent, albeit with D.Y.F.S.'s continued obligation to provide services and to monitor the home life; or 2) whether their best interests were served by ordering a change in residential custody. In this case, no hearing was held to consider that difficult issue and, in light of conflicting informal accounts of the children's own preferences and D.Y.F.S.'s own recommendations, it was a mistaken exercise of discretion for the judge to grant D.Y.F.S.'s request and terminate the proceedings without a full custody hearing.
[G.M., supra, 398 N.J.Super. at 40, 939 A.2d 239.]
In this case, we note: (1) the children were born in the United States and have resided here their entire lives, (2) the record is replete with the children's strong preference to remain with their mother in the United States, (3) in a separation agreement signed by I.Y.A. and J.L. in 1999, J.L. voluntarily abdicated his parental rights to Tyler (the only child then born) because of his admitted prior violent conduct against I.Y.A., (4) in domestic violence cases there is a statutory presumption "that the best interests of the [children] are served by an award of custody to the non-abusive parent," N.J.S.A. 2C:25-29(b)(11), (5) J.L. violated three court orders by taking the children to Korea, and (6) prior to their removal, the children were succeeding academically in New Jersey. Given this factual scenario, we conclude, as did the court in G.M., that a full evidentiary hearing is necessary to determine whether the children's best interests are served by their continued residence with their mother.
Thus, on remand, I.Y.A. is entitled to a new fact-finding hearing to determine whether the children were abused or neglected, and an evidentiary hearing must be held prior to a transfer of custody to the children's father. We express no opinion as to the ultimate resolution of either of these determinations. In light of our disposition, we do not address Point IV, I.Y.A.'s claim that "DYFS failed to provide reasonable services," and we find I.Y.A.'s remaining contentions are without sufficient merit to warrant discussion. See R. 2:11-3(e)(1)(E).
Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.