# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4004-21

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

E.T. and R.H.,

     Defendants,

and

R.E.T.,

     Defendant-Appellant.

_____

IN THE MATTER OF L.T. and
K.M., minors.

_____

Submitted December 20, 2023 – Decided March 25, 2024

Before Judges Accurso, Gummer and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FN-04-0181-21.

Joseph E. Krakora, Public Defender, attorney for appellant (David Anthony Gies, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Mary L. Harpster, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor K.M. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Neha Gogate, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant R.E.T. appeals from the Family Part's February 11, 2022 order, now final, that defendant abused and neglected his then fifteen-year-old stepdaughter Kyra in violation of N.J.S.A. 9:6-8.21(c)(3) by engaging in acts of sexual abuse.[1] Because we conclude there is substantial credible evidence in the record to support the court's finding, we affirm.

---

[1] Consistent with the names used by the parties in their briefs, parties' fictitious names are used here for clarity and confidentiality to protect the anonymity of the children. R. 1:38-3(d)(12).

A-4004-21

## I.

In August 2020, when Kyra was fifteen years old, she disclosed to her best friend, Ellen, that defendant had been sexually abusing her since the age of ten. Ellen told Kyra's mother, Elsa, about Kyra's allegations.

According to Elsa, she asked Kyra about the allegations the next day and Kyra started cursing and yelling at her. Elsa also stated that she had called Kyra's care management organization (CMO) team to inform them about what Kyra had said.[2] Kyra's behavioral therapist and psychiatrist went to the home to meet with Elsa and Kyra about the allegations of abuse. Kyra told them she wanted to hurt herself; they advised Elsa to take her to the hospital.

Kyra's CMO team referred the matter to the Division. Crawley interviewed Elsa at the hospital. Elsa told him Kyra had an extensive mental-health history; specifically, that she had been seeing therapists and had been with a CMO team since the age of nine or ten. Elsa also reported that Kyra had been diagnosed with bipolar disorder, anxiety, intermittent explosive disorder, post-traumatic stress disorder (PTSD), oppositional defiant disorder and

---

[2] According to William Crawley, an investigator with New Jersey Division of Child Protection and Permanency (Division or DCPP), Elsa indicated Kyra worked with a CMO worker, a behavioral therapist, a psychiatrist, and a psychologist. Elsa referred to them as Kyra's "CMO team."

attention-deficit/hyperactivity disorder (ADHD) and had been prescribed various medications. She further explained Kyra had a history of behavioral problems at home and at school including lying, stealing, and defiance.

After speaking with Elsa, Crawley spoke with Kyra in her hospital room. Kyra stated that she had "told her best friend that her stepfather 'raped her' [two and a half] months ago and it's been happening since [she] was [ten]." Crawley reported Kyra's abuse allegations to the Camden County Prosecutor's Office - Special Victim's Unit Detective Cody Skinner.

The next day, Detective Skinner interviewed Kyra, who disclosed details of the sexual abuse.[3] She elaborated on an incident of sexual abuse that had occurred about two and a half months prior while Elsa and Kyra's younger sister "were at dance [class]" and she was home alone with defendant:

> He took my clothes off and told me to take my clothes
> off too. His penis was hard. After I took my clothes
> off, he had sex with me, and I just laid there. I did not
> know what to do. After he had sex with me, he would
> take a shower and take me to Wendy's to eat.

On that occasion, Kyra stated defendant "put his penis in [her], and it lasted for a few minutes" and that "[n]ormally he would finish . . . [o]n [her]

---

[3]  A recording of Detective Skinner's interview was transcribed into the Division's investigation report.

back and stomach." She explained to Detective Skinner she did not "remember exactly" the first time defendant had sexually abused her but recalled the abuse had begun when the family, including defendant, lived at Kyra's maternal grandmother's home for two to three years. She explained that on a different occasion that when she was fourteen-years old, defendant had come home after working the night shift, "woke [her] up and . . . turned [her] over[,] took [her] clothes off and had sex with [her]." She also disclosed that "[h]e made [her] grab his penis and move his hand how he wanted [her] to move it," but that "he made [her] stop jerking him off when [she] was [ten to thirteen] years old." She stated she believed he had made her have sex with him "[thirty to forty] times . . ." and "[i]t would he in his room when [her] mother and sister were not home [and] [h]e used to hit [her] at [fourteen] and [Elsa] would tell him to stop." She recalled defendant "would slap her in the face . . . [and] [h]e would hit [her] from [twelve to fourteen] years old." Defendant would tell Kyra "not to tell [her] mother [and] [h]e would bribe [her] with money when [she] was younger." She explained that the abuse would happen when Elsa and her sister went to dance on "Wednesday[s] and Mondays" but also "when he would come home at night after working the night shift." She also stated that "he took a picture of

[her] lying there one time when [she] was ten at the apartment on Central Ave[nue]" with her clothes off and then "had sex with [her]" after.

The Division filed a complaint for abuse and neglect against defendant and Elsa, alleging defendant had sexually abused Kyra and seeking to assume her custody, care and supervision.

Months later, the matter proceeded to a fact-finding hearing. The Division presented two witnesses, Kyra and Stephanie V. Lanese, M.D., and entered three exhibits into evidence without objection: (1) Crawley's investigation report, (2) Dr. Lanese's curriculum vitae and (3) Dr. Lanese's New Jersey CARES report.[4]

Defendant testified and called Kyra's maternal aunt as a witness. The parties also stipulated to the entry of the Division's investigative report, obviating the need for investigator Crawley to testify.

At the hearing, Kyra testified that defendant had begun sexually abusing her when she was about nine or ten years old, when the family lived with her maternal grandmother and that defendant "had been raping [her] for five years" by the time she finally reported the abuse to Ellen. She also testified that she had disclosed the details of defendant's ongoing sexual abuse to Ellen because

---

[4]  CARES is an acronym for Child Abuse Research Education and Service Institute.

she believed that her mother and sister would be going out that same evening, leaving her at home alone with defendant. According to Kyra, as she had done many times in the past, she asked Ellen to spend the night at her home and when Ellen did not initially agree to sleep over, she confided the details of defendant's ongoing sexual abuse. Kyra testified she had told Ellen about the abuse because "she felt very comfortable with her" and that after she told her what defendant had been doing to her, they both started crying.

Kyra testified the abuse would start by defendant asking her "if [she] wanted to play" and that she came to learn what "play" meant because defendant "would force [her] until eventually [she] put two and two together." She described the abuse in detail, stating it would typically occur when her mother was at work, her mother and younger sister were at dance, or when she was left at home alone with defendant. Kyra also recounted that defendant would undress himself and her and "position [her] how he wanted," and "put his penis in [her] vagina," and that she was also "force[d]" to perform oral sex. She stated defendant would stop when someone came home or he would "finish on [her] back . . . or stomach." She also testified defendant had told her to keep the abuse

7

a "secret" from her mother.[5]  In describing where the abuse took place, Kyra testified defendant would force her to have sex with him usually in the bedroom he shared with her mother, her bedroom, or the basement.

Dr. Lanese testified that her initial evaluation of Kyra occurred via telemedicine because of the COVID-19 pandemic protocols, but that she had examined Kyra in-person the following day.[6]  She testified Kyra had told her defendant "would undress her completely, undress himself, and position her however he wanted, and put his penis in her vagina and then when he finished, he finished on her back or stomach."  Kyra also described feeling "hurt and used but she denied having any physical problems."  Dr. Lanese testified Kyra had told her that "some of this interaction started when she was ten and had been ongoing for the past five years."  When asked about Kyra's "delayed disclosure," Dr. Lanese explained it was "quite common" for children to delay reporting sexual abuse for "multiple reasons" and further explained that:

> most children tell me they were scared to tell.  They were afraid of what would happen once they told, the consequences of telling.  A lot of children are afraid they're going to get in trouble, especially when they're

[5] Elsa denies knowing about the abuse, and nothing in the record suggests that Kyra had told her mother about the abuse prior to her disclosure to Ellen.

[6] At the start of the hearing, all parties stipulated to Dr. Lanese's qualification as an expert in pediatrics and child abuse.

8

younger because they feel like they participated in the act and that they hold some of the blame. Some of them have been threatened. So some children don't want to tell until they feel like they're safe.

. . .

Sometimes, they just won't think they're going to be believed and sometimes they're just so ashamed of what happened to them that they don't want to tell anyone.

When asked to address Kyra's behavioral issues, Dr. Lanese explained that children often do not know how to describe or understand what happened to them, and this uncertainty can manifest as aggression, anxiety, and anger. She reiterated that a child's reaction to the trauma can present similarly to ADHD and may be misdiagnosed.

On cross examination, defense counsel challenged her diagnostic assessment based on the fact that Kyra had not allowed an examination of her genitalia. Dr. Lanese responded that a genital exam would not necessarily provide any physical evidence of abuse because bodies accommodate sexual acts and injuries, if they occur, can heal. She further explained the lack of physical evidence was not dispositive because Kyra had provided an extensive history of her abuse and it was not uncommon for doctors to make diagnoses based on history alone without any physical findings. Dr. Lanese used the example of a

patient who complains of a headache and a doctor's diagnosis thereof to illustrate that no physical evidence is necessary in some cases.

In his testimony, defendant denied all allegations of abuse. He testified that he had been in Kyra's life since she was three years old and that Kyra started calling him "daddy" about a year after he and Elsa had been together. Despite acknowledging that Kyra was an excellent student and was involved in several extracurricular activities, defendant focused on Kyra's behavioral issues that he said had begun in preschool and escalated as she got older.

He testified that when she was about eight-years old, Kyra's behavior was so concerning that he and Elsa sought out family services from CMO. He also testified that Kyra had begun misbehaving more frequently during the summer of 2020—when Kyra was fifteen—which he attributed to his belief that she was no longer taking her medications.

Defendant further testified that around August 2020, he and Elsa had taken away Kyra's phone and revoked her social-media privileges as punishment for her poor behavior. He discussed gaining access to her cell phone and finding Kyra had posted videos and naked pictures of herself and was talking about multiple sex partners on social media. Defendant maintains that Kyra made up

10

the allegations of sexual abuse against him as retribution for punishing her for her behavior, including taking away her phone.

At the close of the hearing, the judge rendered a decision from the bench, finding the Division had proved by a preponderance of the evidence that Kyra was an abused and neglected child pursuant to N.J.S.A. 9:6- 8.21(c)(3) because defendant had sexually abused her. Regarding Dr. Lanese's testimony, the judge recounted the details of the abuse as described in Dr. Lanese's report and concluded Dr. Lanese's testimony was consistent with her report and helpful in understanding Kyra's overall behavioral issues and her delay in disclosing the abuse.

The judge acknowledged the case turned on the credibility of the witnesses—Kyra and defendant—given their divergent testimony, stating:

> I think overall what I'm gathering from the defense's standpoint is the defense would have this [c]ourt believe that [Kyra] is not telling the truth and that she's making up these allegations as retaliation against her parents for punishing her or taking her phone away or as another way of her acting out of her mental health disorders such as her Oppositional Defiance Disorder, bipolar, anxiety, ADHD[.]

However, the judge did not believe Kyra had lied about the abuse "because she was mad at her parents for taking away her phone or that she wanted to live with her grandparents."

The judge also addressed Kyra's diagnosed mental-health disorders and noted that based on the testimony and evidence, there was no dispute Kyra had had emotional and behavioral issues throughout most of her life for which she had received various forms of treatment. The judge found Kyra had testified credibly, stating:

> In my opinion, it makes sense based upon Dr. Lanese's testimony that [Kyra] did delay this disclosure. It makes sense that she told her best friend because according to [Kyra] she knew that [Ellen] would tell [Kyra's mother], and she admitted that she and her mother had a rocky relationship in the summer of 2020 and so [Kyra] most likely knew that her mother wouldn't believe her. And [Kyra] was right, her mother did not believe her. And her grandmother did not believe her at first. . . so I find [Kyra's] testimony to be credible. Although she had somewhat of a flat affect, she answered all questions directly on direct as well as cross-examination. I find that her demeanor based upon my observations [was] the same on direct as well as on cross. I think she was appropriately upset when she was answering questions about what was found by her parents on her phone in August of 2020.

In contrast, the judge did not find defendant's arguments and explanations credible or believable. She found "a distinct difference in his demeanor on cross-examination than on direct examination" and that his testimony "actually corroborate[d] some of [Kyra's] testimony with respect to overnights and [her] new friendship [with Ellen.]" The judge also opined that some of defendant's

behavior "seemed a little bit odd" and found defendant combative when he testified about the Division's investigator "pestering [him]." She also stated his combative demeanor on cross-examination "led [her] to believe that he was not telling the truth."

On February 11, 2022, the judge entered an order in which she found, by a preponderance of the evidence, R.E.T. had abused and neglected Kyra pursuant to N.J.S.A. 9:6-8.21(c). In a July 15, 2022 order, the judge terminated the litigation, awarded joint legal custody of Kyra to Elsa and Kyra's father and physical custody of Kyra to her father and barred defendant from having contact with Kyra.

Defendant raises the following issues for our consideration in this appeal.

> POINT I
>
> THE FAMILY COURT JUDGE'S SINGULAR FOCUS ON THE DCPP EXPERT'S OPINION REGARDING THE CHILD'S DELAYED DISCLOSURE IMPROPERLY INFLUENCED THE COURT'S EVALUATION OF THE IMPLICATIONS TO BE DRAWN FROM THE TOTALITY OF THE EVIDENCE.
>
> POINT II
>
> THE DCCP EXPERT'S DIAGNOSIS WAS A "NET OPINION" BECAUSE SHE DID NOT EXPLAIN HOW SHE DISTINGUISHED BETWEEN TRAUMA AND A MENTAL HEALTH DISORDER. (Not Raised

13

Below)

POINT III

[DEFENDANT'S] TRIAL ATTORNEY RENDERED A CONSTITUTIONALLY INEFFECTIVE PERFORMANCE AS LEGAL COUNSEL WHERE HE DID NOT OBJECT TO THE DCPP EXPERT'S NET OPINION.  (Not Raised Below)

II.

Review of a family court's findings of fact is limited.  N.J. Div. of Youth & Family Servs. v. I.Y.A., 400 N.J. Super. 77, 89 (App. Div. 2008).  The reviewing court must determine whether the findings are supported by adequate, substantial, credible evidence.  Ibid.  Deference is afforded to a trial court's credibility determinations because the trial court had the ability to observe the demeanor, tone, and physical actions of all the witnesses during the hearing.  N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279, 293 (2007) (citing State v. Johnson, 42 N.J. 146, 161 (1964)).  The factual findings will not be disturbed unless the findings go "'so wide of the mark that a mistake must have been made.'"  Ibid. (quoting Pioneer Nat'l Title Ins. Co. v. Lucas, 155 N.J. Super. 332, 338 (App Div. 1978)).

Under Title Nine, an "abused or neglected child" means a child less than eighteen years of age whose parent or guardian:

(1) inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ; (2) creates or allows to be created a substantial or ongoing risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted loss or impairment of the function of any bodily organ; (3) commits or allows to be committed an act of sexual abuse against the child; (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court.

[N.J.S.A. 9:6-8.21(c).]

The Division must prove abuse or neglect of a child by a preponderance of the evidence. N.J.S.A. 9:6-8.46(b). Prima facie evidence that a child has been abused or neglected includes: "proof of injuries sustained by a child or of the condition of a child of such nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parents or guardian." N.J.S.A. 9:6-8.46(a)(2). Proofs must be evaluated based on the totality of the

15

circumstances "because the evidence can be synergistically related." N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 39 (2011).

Ordinarily, a child's out-of-court statements "relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact-finding of abuse or neglect." N.J.S.A. 9:6-8.46(a)(4). Corroboration requires "direct or circumstantial evidence beyond the child's statement itself." Critically, however, in New Jersey Division of Child Protection & Permanency v. Y.A., we held "the corroboration requirement of the statute does not apply where the child victim testifies to the abuse at a fact-finding hearing." 437 N.J. Super. 541, 542 (App. Div. 2013).

Defendant argues the judge erred by relying on Kyra's "material inconsistencies between her Zoom testimony and DCPP's investigation summary" and asserts "Dr. Lanese's written report did not corroborate the teenager's testimony either." He also contends Kyra fabricated the claims of sexual abuse and was motivated by animus and revenge for discipline defendant had imposed as a consequence for her inappropriate posts on social media. Alternatively, he suggests the claims are the result of her ongoing psychological issues. In support of these contentions, defendant points to Kyra's psychological

and behavioral challenges exhibited throughout her childhood. He maintains that she is not to be believed and argues that the judge's singular focus on the Division's expert's opinion regarding Kyra's delayed disclosure improperly influenced the court's evaluation of the implications to be drawn from the totality of the evidence.

Defendant further argues the Division's expert's report constitutes a net opinion because Dr. Lanese did not explain how she distinguished between trauma and a mental-health disorder. Lastly, defendant claims trial counsel was ineffective for failing to object to Dr. Lanese's testimony and report.

The judge issued a comprehensive and thorough opinion finding Kyra's testimony more credible and believable than defendant's, stating she found Kyra's live testimony consistent with the Division's investigation report and Dr. Lanese's report. She specifically referred to Kyra's disclosure to her best friend Ellen. The judge also relied on Dr. Lanese's explanation of why children delay disclosing abuse. On this point, the judge found "it was not unusual for her not to tell these healthcare providers during the five years that this was going on because she did not feel comfortable telling them and she was only ten years old when it started."

The judge also found "the manner of [Kyra's] disclosure . . . all ma[de] sense to [her.]" She further acknowledged the possibility, based on her review of the evidence and testimony, that "one of the reasons why she didn't say anything [was] because she had a bad relationship with her mother in particular the summer of 2020," around the time of the disclosure to her best friend.[7]

Contrary to defendant's arguments, the judge considered Kyra's history of psychological issues when she stated "the defense would have this [c]ourt believe that [Kyra] is not telling the truth and that she's making up these allegations as retaliation against her parents for punishing her or taking her phone away or as another way of her acting out of her mental health disorders such as her Oppositional Defiance Disorder, bipolar, anxiety, ADHD . . . ."

Critically, however, the judge did not find defendant's arguments and explanations credible or believable. She found his demeanor during cross-examination was combative, and that his testimony corroborated Kyra's testimony as to her friendship with Ellen and the overnight stays.

---

[7] Moreover, the judge's findings were clearly based on her view of Kyra's testimony detailing the acts of sexual abuse, statements which did not require corroboration to support a finding of abuse against defendant. See Y.A., 437 N.J. Super. at 542.

We are also persuaded that the judge correctly considered evidence of Kyra's psychological and mental-health diagnoses in the context of her findings as to Kyra's behavior given Dr. Lanese's explanation that "it could seem like a child is suffering from mental health issues but it's really the trauma." We further recognize that because allegations of sexual abuse involve conduct that is deeply personal and offensive, and generally shrouded in secrecy—rarely involving witnesses—courts are ultimately tasked with deciding these cases based on the credibility of those directly involved—the alleged perpetrator and victim. Such was the case here; where Kyra alleged conduct that took place when she was at home alone with defendant or late at night and for which there were no witnesses.

On hearing the evidence, the judge correctly based her decision on the testimony and evidence presented and decided whom to believe based on their testimony—what made sense, what was believable and observations of each witness's demeanor. M.M., 189 N.J. at 293. In doing so, she concluded, based on testimony she found more credible than defendant's denials, that defendant had sexually abused Kyra.

On this basis, we discern no error in the judge's findings and opinion. As previously stated, our review of the family court's findings of fact is limited,

19

<u>I.Y.A.</u>, 400 N.J. Super. at 89, and the court's findings will be upheld where there is adequate, substantial, credible evidence in the record to support those findings. Defendant's alternative theories and his efforts to discredit Kyra's testimony are unavailing as there is a sufficient basis to uphold the judge's findings based on the detailed testimony presented by Kyra, which the judge found to be credible. The judge "ha[d] the opportunity to make first-hand credibility judgments about the witnesses who appear[ed] on the stand; [and had] a feel of the case that can never be realized by a review of the cold record." <u>N.J. Div. of Youth and Fam. Servs. v. E.P.</u>, 196 N.J. 88, 104 (2008). Moreover, as previously stated, we have long recognized "[b]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding," and the conclusions that flow logically from those findings of fact. <u>Cesare v. Cesare</u>, 154 N.J. 394, 413 (1998). Against this backdrop, we discern no basis to disturb the judge's decision.

Defendant's argument that Dr. Lanese's testimony constituted an impermissible net opinion because she failed to explain how she distinguished between trauma and a mental-health disorder is undermined by the trial record. The net opinion rule "requires that an expert '"give the why and wherefore" that

supports the opinion, "rather than a mere conclusion."'" Townsend v. Pierre, 221 N.J. 36, 54 (2015) (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 327 (2011))). "The rule . . . mandates that experts 'be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable.'" Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)).

Our review of Dr. Lanese's report and testimony reveals the details of her discussion with Kyra regarding the sexual abuse, her opinion regarding why some victims of assault delay disclosure, and the recommendation that Kyra seek a mental-health professional for trauma-based counseling "because she experienced a trauma." As we explained in New Jersey Division of Child Protection and Permanency v. I.B., 441 N.J. Super 585, 589-91 (App. Div. 2015), the type of "psychological evidence of emotional effects," as discussed by Dr. Lanese, is "routinely admitted in Title Nine cases" and "admissible as substantive evidence to corroborate the child's allegations of abuse." See N.J. Div. of Youth and Fam. Servs. v. Z.P.R., 351 N.J. Super. 427, 436 (App. Div. 2002).

Contrary to defendant's claims, Dr. Lanese explicitly discussed the relationship between trauma from the sexual abuse and mental-health disorders and explained "if you have a child who has some mental health issue to begin with, it [the abuse] can exacerbate those mental health issues."  And, in response to a question about whether it could seem like a child is suffering from mental health issues but it's really the trauma, Dr. Lanese responded "[a]ctually yes. We have, several children that it's really PTSD, it's from the trauma, but they present similar to ADHD.  So they are hyperactive."

Dr. Lanese further discussed her recommendation that Kyra see a mental-health professional "to evaluate the full extent of her disclosures for her statements" and recommended that they be trauma-based because in her opinion, "she [Kyra] experienced a trauma."  Moreover, on cross-examination, when asked about Kyra's history of bipolar disorder, Dr. Lanese responded, "I am not negating her history of bipolar disorder."  Rather than providing a "mere conclusion," as argued by defendant, Dr. Lanese "gave the why and wherefore" supporting her opinion, Townsend, 221 N.J. at 55 (internal quotations omitted), and "offer[ed] objective support [grounded in the evidentiary record] for . . . her opinions," Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 410 (2014) (quoting Pomerantz Paper Corp., 207 N.J. at 373).  Thus, Dr. Lanese's opinion

22

did not constitute a net opinion and, thus, was admissible.

Finally, defendant argues trial counsel's performance was constitutionally deficient under the standard set forth in Strickland v. Washington, 466 U.S. 668, 687-688 (1984), as adopted by our Supreme Court in State v. Fritz, 105 N.J. 42, 58 (1987).[8] Specifically, he argues trial counsel was ineffective by failing to: challenge Dr. Lanese's written report through a pretrial motion, object to the admission of Dr. Lanese's written report at the fact-finding hearing, object to her opinion regarding the reasons a child may delay disclosure, and challenge Dr. Lanese's expert opinion testimony through a post-trial motion.

Defendant's claims against trial counsel are belied by the record, which shows trial counsel's extensive cross-examination of Dr. Lanese as to the basis for her report. Specifically, trial counsel was able to elicit testimony whereby

---

[8] The New Jersey Supreme Court adopted the Strickland/Fritz two-part test in parental termination cases to determine whether counsel was ineffective. N.J. Div. of Youth and Fam. Servs. v. B.R., 192 N.J. 301, 308-09 (2007). In B.R., the Court "direct[ed] that claims of ineffective assistance in termination cases be raised on direct appeal." 192 N.J. at 311. The Court elaborated that "[i]n many cases, the issue will be resolvable on the appeal record alone" and expounded that "approaching the issue of effective assistance of counsel during the direct appeal process . . . is the most timely and efficient method for resolving that important issue." Id. at 311-12. The Court Rules have since reflected that in Division appeals "[c]laims of ineffective assistance of trial counsel shall be raised exclusively on direct appeal of a final judgment or order." R. 5:12-7.

Dr. Lanese conceded that "she is not negating [Kyra's] history of bipolar disorder," her report was based on Kyra's statements, Kyra had refused to submit to a physical exam, and that she had not interviewed defendant.

Moreover, we concur with the State's position that trial counsel's decision not to object to the admission of Dr. Lanese's expert report was not deficient as counsel used the report to cross-examine Dr. Lanese. Based on this record, defendant fails to show trial counsel's performance fell outside the realm of professionally acceptable performance, and, but for this claimed deficiency, there is a reasonable probability he would have prevailed at trial. See Strickland, 466 U.S. at 687, 699-700.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4004-21