# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2186-18T3
A-2188-18T3[1]

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

 Plaintiff-Respondent,

v.

S.R.C.-B. and K.A.C.,

 Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.-A.M.C.,
J.T.C., and J.M.C.,

 Minors.

_____

Submitted March 26, 2020 – Decided May 20, 2020

Before Judges Suter and DeAlmeida.

---

[1] The cases were consolidated on appeal in order to share transcripts and to permit a single responding brief.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FG-04-0170-18.

Joseph E. Krakora, Public Defender, attorney for appellant S.R.C.-B. (Robyn A. Veasey, Deputy Public Defender, of counsel; Eric R. Foley, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant K.A.C. (Robyn A. Veasey, Deputy Public Defender, of counsel; Kathleen Ann Gallagher, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Ashley L. Davidow, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors J.T.C. and J.M.C. (Cory Hadley Cassar, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor J.-A.M.C. (Damen John Thiel, Designated Counsel, on the brief).

PER CURIAM

S.R.C.-B. (Sharon) and K.C. (Kyle) appeal the January 7, 2019 judgment terminating their parental rights to three children. We affirm the trial court's order based largely on the reasons expressed in its comprehensive, oral opinion of the same date.

I.

This case involves three of Sharon and Kyle's children: J-A.M.C. (Jane), born in 2009; J.T.C. (Judy), born in 2010; and J.M.C. (Janet), born in 2011. Judy and Janet are living in the same resource home; their resource parents wish to adopt them and are open to the idea of adopting Jane as well. Jane has been in her current placement in a different home since June 2017. One of her resource parents has not yet committed to adopt her or to permit contact with the other children. The children are securely bonded to each other and only insecurely attached to adults. The alternative plan for the children is select home adoption.

The children have been in placement with resource families for the past seven and one-half years. Janet has been under the care, custody and supervision of the Division of Child Protection and Permanency (the Division) since birth.

In June 2011, the police responded to a welfare check that children had been left alone. The Division's investigation revealed that neither the children nor the apartment were clean. Kyle appeared to be under the influence. He was no longer taking his medication for schizophrenia. He was not working. Sharon was not truthful with the caseworker about who had been left to supervise the children. She was aware of Kyle's mental health condition and that he was not

3

taking medication. The children were removed on an emergency basis and placed with the Division.

The family was known to the Division. As early as 2007, the Division investigated claims that Sharon and Kyle were living with a one-month-old infant (J.C.) without water, heat or electricity and only a little food. In 2008, the Division investigated that J.C. was left alone without supervision. In 2010, the Division received a referral that they spanked J.C. so hard his head hit a wall and were homeless. The allegations of physical abuse were unfounded.

A psychiatric examination of Kyle in July 2011, shortly after the children were removed, concluded he suffered from schizoaffective disorder and cannabis abuse. It was recommended he attend a Mental Illness, Chemical Addiction (MICA) program and receive medication monitoring services.

Sharon participated in a substance abuse evaluation, was referred for intensive outpatient treatment but then was discharged from the program for non-compliance. She was referred to another outpatient program in 2012, but even after that her urine screens in court were positive for marijuana.

In September 2011, Kyle threatened to shoot up the Division offices while the children were present. After he was released from jail for this, he

participated for a short time in programs for medication management, because he had not been consistent in taking his medication, but he stopped attending.

On appeal, neither parent challenges the findings by the trial court that the third prong of the statutory test—N.J.S.A. 30:4C-15.1(a)—was shown by clear and convincing evidence for both Sharon and Kyle. Thus, there is no argument the services provided by the Division were adequate and that other options for placement were explored.

The children were the subject of an earlier termination of parental rights case. In July 2013, a judgment was entered terminating Sharon and Kyle's parental rights to the three children involved here and to J.C. Defendants appealed. While that was pending, the Division learned that one of the children was sexually abused by the pre-adoptive resource parents' child. Sharon's motion to vacate the guardianship was granted, the case was returned to the trial court, continued under a different type of docket number, and the guardianship case was dismissed. After unsuccessful efforts to place all the children with the paternal grandmother and to reunify the girls with Sharon, the Division filed another complaint for termination of parental rights. Kyle and Sharon made an identified surrender of J.C. to the paternal grandmother, who adopted him. She was not able to adopt the other children. This case was tried before the Family

Part in November and December 2018, resulting in a judgment terminating Sharon's and Kyle's parental rights to Jane, Judy and Janet.

The Family Part judge described the issues.

> Noncompliance with services recommended by professionals. Inconsistent, late, not pre-confirmed visits continuing to date, conduct at visits shows lack of parenting authority, control over emotions, lack of attunement to children's needs to date. Clear indication the parents didn't engage and learn from parenting skills programs offered all these years. Unstable housing. Unstable independent housing. Lack of a viable plan for the children for reunification. No realistic plan.

There was ample support in the record for all these conclusions. A psychological evaluation of Sharon in 2011 recommended individual counselling, anger management, a substance abuse evaluation and parenting classes. She was to obtain stable housing and her GED. A subsequent parenting capacity evaluation required both parents to attend a parenting program. Although Sharon completed a substance abuse evaluation and treatment, she continued to test positive for illegal substances. She was discharged from individual therapy. She obtained housing assistance, but left that, moving in with a friend in Somerset County in 2012, but did not add her name to the Section Eight housing voucher until October 2018. The children's names were never added.

6

A cognitive evaluation of Sharon concluded she needed "Parent-Child" Interactive Therapy (PCIT), which was "hands-on parenting." She was provided that service but was discharged for non-compliance.

An updated psychological evaluation recommended the same types of services for Sharon: a substance abuse evaluation, individual counseling, stable housing, employment, parenting skills training, and supervised, therapeutic visitation with the children. She attended the therapeutic visitation for nine months. In 2016, she attended another parenting program and was discharged for nonattendance.

In early 2018, Sharon was referred to another counselor, who provided Sharon with individual counseling and then supervised visitation in order to give her "real time feedback." Although Sharon attended, she characteristically was late for the one-on-one portion of the program and then needed time to "cool down and blow off some steam" which shortened her individual sessions. The counselor reported Sharon continued to need additional "parenting guidance." She did not complete an individual counselling program and was discharged in September 2018. She obtained employment at a restaurant in June 2018 and because of the hours, could not complete her GED.

A-2186-18T3

Kyle's psychological evaluation indicated he needed medication management and substance abuse treatment. He did not have housing or a job. At one point, he was living in a tent near his mother's apartment. Kyle was discharged from two different psychiatric treatments. He tested positive for THC and also was discharged from a MICA program for non-compliance. He was imprisoned from 2014 to 2016. Once released, he had substance abuse treatment but was discharged due to repeated absences and was hospitalized on occasion for psychiatric crises.

By 2018, Kyle was ordered to attend individual counselling, participate in medication monitoring and have parenting training. He only briefly attended the parenting training and did not attend counseling. He would not sign releases for the Division to obtain his medical records.

Dr. Linda Jeffrey conducted psychological and bonding evaluations of the family. She testified Sharon was "egocentric and self-absorbed" causing her to lack insight about her behaviors. Dr. Jeffrey concluded Sharon did not have the capacity to be a responsible and self-sustaining parent. Sharon "was not prepared to provide a minimal level of safe parenting for her children[,]" and had "characterological problems" that were "enduring" meaning "there is much less likelihood of an individual being able to change in terms of these

deep[-]seated problems." She opined the children would not be safe if returned to Sharon.

Dr. Jeffrey testified the children had an "insecure attachment" to Sharon, meaning they did not rely on her as a person who would protect them, but they did recognize her as their mother.

Dr. Jeffrey concluded from her psychological evaluation of Kyle that he suffered from a number of mental health issues including "schizophrenia, adjustment disorder . . . . Other specified personality disorder, a mixed personality disorder with narcissistic, paranoid, and dependent personality disorder features." She opined the children would not be able to rely on him as a caregiver because he could not provide safe parenting for the children.

Her bonding evaluation concluded the children had an "ambivalent insecure attachment" to Kyle, meaning they had "ambivalent feeling toward the attachment figure" signifying there were "feelings of warmth and affection" and also "feelings of alienation and mistrust." In her view, an insecure attachment was harmful to the children, negatively affecting their ability to form long-term attachments to others.

Dr. Roberta DiHoff testified for the Law Guardian. She also conducted a bonding evaluation, concluding that the children she interviewed (Janet and

9                                                                        A-2186-18T3

Judy) had an insecure attachment to their parents and the resource parents, but a secure attachment to each other.

The trial judge heard testimony from the case worker, adoption specialist and from Sharon and Kyle. The court interviewed the children in camera where they expressed their desire to live with their mother, and if not, to remain in their respective resource homes. The children did not say that they wanted to live with Kyle.

The trial court concluded the Division satisfied each prong under N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. The court found it was not safe to return the children, that Sharon and Kyle had not complied with services, had not acquired sufficient parenting skills, despite the services provided, and lacked parental authority over the children. The court found, with respect to the second prong, that Sharon and Kyle had no viable plan for the children after seven years, could not provide safe and effective parenting for the children and could not do so in the foreseeable future. For prong three, which is not challenged on appeal, the court found the Division made "reasonable efforts to provide services to the parents to help them rectify the problems that led to the removal" and detailed those efforts. With respect to prong four, the court found termination would not do more harm than good. Both experts found that the

parents could not safely parent the children, and the children had an insecure attachment to their parents. Delaying a permanent placement for the children would harm them. Nothing in the record supported the children being seriously harmed by severing the parental ties. Termination of parental rights, in contrast, would allow them the ability for permanency. Therefore, taking into consideration the Division's plans for adoption the court found the Division satisfied its burden of showing that "termination of parental rights will not do more harm than good." The court denied defendants' motion for continued visitation pending appeal.

On appeal, Kyle argues:

> THE TRIAL COURT ERRED IN HOLDING THAT DCPP PROVED PRONGS ONE AND FOUR OF THE BEST INTEREST TEST PURSUANT TO N.J.S.A. 30:4C-15.1(a) BY CLEAR AND CONVINCING EVIDENCE; THUS, THE JUDGMENT TERMINATING KYLE'S PARENTAL RIGHTS SHOULD BE REVERSED.
>
> A. The judgment terminating Kyle's parental rights should be reversed because DCPP failed to prove by clear and convincing evidence that termination of Kyle's parental rights will not do more harm than good.
>
> B. The judgment terminating Kyle's parental rights should be reversed because DCPP failed to prove by clear and convincing evidence that his daughters'

11

safety, health or development has been or will continue to be endangered by their relationship with Kyle.

On appeal, Sharon argues:

> THE JUDGMENT OF GUARDIANSHIP SHOULD BE REVERSED BECAUSE THE COURT MISAPPLIED THE LAW IN FINDING THAT DCPP MET ITS BURDEN OF PROOF UNDER THE SECOND AND FOURTH PRONGS OF THE "BEST INTEREST" STANDARD PURSUANT TO N.J.S.A. 30:4C-15.1.
>
> A.   The trial court misapplied the prevailing legal standards under the fourth prong of the "best interest" standard where: the prospects for adoption are speculative at best; the children will be harmed by their likely separation; and because the children prefer to be reunified with S.C-.B.
>
> B.   The trial court misapplied the prevailing legal standards under the second prong of the "best interest" standard and where the court determined that S.C.-B. was unwilling to remedy the harm to the children.

## II.

N.J.S.A. 30:4C-15.1(a) authorizes the Division to petition for the termination of parental rights in the "best interests of the child" if the following standards are met:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

A trial court's decision to terminate parental rights is subject to limited appellate review. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007); see Cesare v. Cesare, 154 N.J. 394, 413 (1998) ("Because of the family courts' special . . . expertise in family matters, appellate courts should accord deference to family court factfinding."). The family court's decision to terminate parental rights will not be disturbed "when there is substantial credible evidence in the record to support the court's findings." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008).

A.

Kyle argues the trial court erred when it found clear and convincing evidence that prong one of N.J.S.A. 30:4C-15(a) was satisfied and that his relationship with his daughters endangered or would endanger their safety, health or development. He argues he wants to maintain contact with them even if he is not the primary parent. However, there was substantial credible evidence to support the trial court's finding under this prong.

This prong focuses "on the effect of harms arising from the parent-child relationship over time on the child's health and development." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). The harm "must be one that threatens the child's health and will likely have continuing deleterious effects on the child." Id. at 352.

There is no question that "a psychiatric disability can render a parent incapable of caring for his or her children." N.J. Div. of Youth & Family Servs. v. I.Y.A., 400 N.J. Super. 77, 94 (App. Div. 2008). This is so even if parents are otherwise "morally blameless." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001).

The record supported the finding that Kyle posed a threat of harm to the children. His mental health conditions remained largely untreated because of

his failure to take medication, or participate in medication monitoring or mental health services until he was in crisis. He demonstrated long-term lack of housing and employment, rendering him unable to provide safely for the children. He demonstrated an inability to control his emotions—at one point threatening, in front of the children, to shoot up the Division office. Although he wanted to remain in contact with the children, even if he was not the primary caretaker, this would not allow the children to obtain a permanent, stable relationship with an adoptive family, which would then further harm the children.

B.

Sharon argues the trial court erred when it found clear and convincing evidence that prong two of N.J.S.A. 30:4C-15(a) was satisfied and that she was unwilling or unable to remedy the harm that her relationship caused the children. She claims she secured employment, stable housing, visited her children and did not abuse drugs.

Under prong two, the Division must show a parent is unable or unwilling to correct the circumstances that led to the Division's involvement. K.H.O., 161 N.J. at 348-49. "The question is whether the parent can become fit in time to meet the needs of the child." N.J. Div. of Youth & Family Servs. v. T.S., 417 N.J. Super. 228, 244 (App. Div. 2010).

15

The record supported the trial court's finding that this prong was satisfied. After the first termination of rights order was vacated, Sharon did not complete parenting classes, was frequently late to counselling sessions and continued to need guidance in the supervised parenting sessions. She considered the individual counseling she received to be of little benefit. Sharon went years without getting her name added to the section eight housing voucher where she lived and never added the children's names. Although employed, she had not considered the school schedule of the three children or that she might have to pay for child care. She did not have unsupervised visitation with the children for over seven years because it was never recommended. She did not rebut the testimony of the expert witnesses that she could not safely parent the children and would not be able to do so in the foreseeable future despite the provision of multiple services.

## C.

Sharon and Kyle contend the trial court erred by finding termination of their parental rights would not do more harm than good. Although the children's current resource homes were willing to adopt, the Division was also pursuing select home adoption as an alternative plan in the event their current placements did not work out. Sharon and Kyle assert there should not be termination

16

because there is no assurance the children will be adopted, and separation would cause more harm.

In evaluating prong four, the trial court must balance the children's relationships with their birth and resource parents and determine whether they will suffer greater harm from the termination of ties with the former than with the latter. In re Guardianship of J.N.H., 172 N.J. 440, 478 (2002) (citing K.H.O., 161 N.J. at 355). Prong four does not require that "no harm will befall the child as a result of the severing of biological ties." K.H.O., 161 N.J. at 355. A court must consider "the child's age, her overall health and development, and the realistic likelihood that the [natural] parent will be capable of caring for the child in the near future." Id. at 357.

We agree there was substantial evidence to support the trial court's finding that neither defendant would be able to safely care for their children in the foreseeable future. Neither party gained meaningful insight into the problems that resulted in their removal or how to address the issues. It was not rebutted that the children's attachment to their parents was insecure and that delay in permanency would continue to harm the children. Termination of parental rights was a step toward permanency. In these circumstances, the trial court had ample support for its determination that the children's continued status without

17

permanency with an insecure attachment to their parents was more harmful than the termination of parental rights that would allow for their adoption.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

18

A-2186-18T3